## Exhibit A

## Combined Disclosure Statement and Plan

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MOLECULAR TEMPLATES, INC., *et al.*,[1] | Case No. 25-10739 (BLS) |
| Debtors. | (Jointly Administered) |

**REVISED COMBINED DISCLOSURE STATEMENT
AND JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR
MOLECULAR TEMPLATES, INC. AND ITS AFFILIATED DEBTOR**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Eric D. Schwartz (No. 3134)
Andrew R. Remming (No. 5120)
Luke Brzozowski (No. 7377)
1201 N. Market Street, 16th Floor
Wilmington, Delaware  19801
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
aremming@morrisnichols.com
lbrzozowski@morrisnichols.com

*Counsel to the Debtors and Debtors in Possession*

June 27, 2025

---

[1]   The Debtors in these chapter 11 cases, along with the Debtors' federal tax identification numbers, are: Molecular Templates, Inc. (9596) and Molecular Templates OpCo, Inc. (6035).  The Debtors' mailing address is:124 Washington Street, Ste. 101, Foxboro, MA 02035.  All Court filings can be accessed at: https://www.veritaglobal.net/MolecularTemplates.

TABLE OF CONTENTS

Page

DISCLAIMER ...................................................................................................................1

INTRODUCTION ............................................................................................................2

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION .........................3

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS
AND ESTIMATED RECOVERIES.................................................................................16

 2.1  General Rules of Classification .................................................16
 2.2  Unimpaired Classes of Claims .................................................20
 2.3  Impaired Classes of Claims .....................................................20
 2.4  Impaired Class of Interests.......................................................21

ARTICLE III BACKGROUND AND DISCLOSURES .....................................................21

 3.1  General Background ..................................................................21
 3.2  Events Leading to Chapter 11...................................................23
 3.3  The Chapter 11 Cases ...............................................................25

ARTICLE IV CONFIRMATION AND VOTING PROCEDURES.................................29

 4.1  Confirmation Procedure............................................................29
 4.2  Procedure for Objections ..........................................................29
 4.3  Requirements for Confirmation ................................................29
 4.4  Classification of Claims and Interests ......................................29
 4.5  Impaired Claims or Interests ....................................................31
 4.6  Confirmation Without Necessary Acceptances; Cramdown. ....31
 4.7  Feasibility..................................................................................32
 4.8  Best Interests Test and Liquidation Analysis............................33
 4.9  Acceptance of the Plan..............................................................34

ARTICLE V CERTAIN RISK FACTORS TO BE CONSIDERED
PRIOR TO VOTING ......................................................................................................34

 5.1  The Plan May Not Be Accepted ...............................................34
 5.2  The Plan May Not Be Confirmed .............................................35
 5.3  Distributions to Holders of Allowed Claims under the Plan May Be
    Inconsistent with Projections ....................................................35
 5.4  Objections to Classification of Claims......................................35
 5.5  Failure to Consummate the Plan ...............................................36
 5.6  Allowance of Claims May Substantially Dilute the Recovery to
    Holders of Claims under the Plan .............................................36

| 5.7 | Plan Releases May Not Be Approved | 36 |
| 5.8 | Certain Tax Considerations | 36 |

**ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS** ....................................37

| 6.1 | Administrative Claims | 37 |
| 6.2 | Fee Claims | 39 |
| 6.3 | DIP Claims | 40 |
| 6.4 | Tax Claims | 40 |

**ARTICLE VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS** .............40

| 7.1 | Class 1: Other Secured Claims | 41 |
| 7.2 | Class 2: Other Priority Claims | 41 |
| 7.3 | Class 3 Prepetition Secured Claims | 41 |
| 7.4 | Class 4: General Unsecured Claims | 41 |
| 7.5 | Class 5: Intercompany Claims | 41 |
| 7.6 | Class 6: Interests | 42 |
| 7.7 | Reservation of Rights Regarding Claims and Interests | 42 |

**ARTICLE VIII ACCEPTANCE OR REJECTION OF THE PLAN** .............................42

| 8.1 | Classes Entitled to Vote | 42 |
| 8.2 | Acceptance by Impaired Classes of Claims. | 42 |
| 8.3 | Presumed Acceptance by Unimpaired Classes | 42 |
| 8.4 | Presumed Rejections by Impaired Classes | 43 |
| 8.5 | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 43 |
| 8.6 | Controversy Concerning Impairment | 43 |
| 8.7 | Elimination of Vacant Classes | 43 |
| 8.8 | Voting Classes; Deemed Acceptance by Non-Voting Classes. | 43 |

**ARTICLE IX MEANS OF IMPLEMENTING THE PLAN** ......................................43

| 9.1 | Joint Chapter 11 Plan. | 43 |
| 9.2 | Restructuring Transaction. | 44 |
| 9.3 | Plan Funding. | 44 |
| 9.4 | Distributions on the Effective Date/Dissolution of Debtors | 44 |
| 9.5 | Liquidating Trust | 45 |
| 9.6 | Liquidating Trustee | 46 |
| 9.7 | Fees and Expenses | 49 |
| 9.8 | Elimination of Duplicate Claims | 49 |
| 9.9 | Distributions | 49 |
| 9.10 | Corporate Action | 49 |
| 9.11 | Directors, Officers, Managers, Members and Authorized Persons of the Debtors. | 50 |
| 9.12 | Closing of the Chapter 11 Cases | 50 |
| 9.13 | Effectuating Documents; Further Transactions. | 50 |
| 9.14 | Release of Liens. | 50 |

9.15    Exemption from Certain Transfer Taxes .......................................................51
9.16    Withdrawal of Plan ......................................................................................51
9.17    D&O Policies. ..............................................................................................51
9.18    Indemnification of Directors, Officers, and Employees. ...........................52
9.19    Withholding and Reporting Requirements. ................................................52
9.20    Cancellation of Existing Interests, Securities and Agreements
        (Including Cancellation of any Authorized but Unissued Shares).............53

ARTICLE X EFFECT OF PLAN ON CLAIMS AND INTERESTS ................................53

10.1    Binding Effect..............................................................................................53
10.2    Treatment of Claims ....................................................................................54
10.3    Discharge of Claims.....................................................................................54
10.4    Injunctions....................................................................................................55
10.5    Exculpation ..................................................................................................55
10.6    Releases by the Debtors ...............................................................................56
10.7    Releases by Holders of Claims ....................................................................57
10.8    Extinguishment of Intercompany Claims ....................................................58
10.9    Terms of Injunctions or Stays .....................................................................58

ARTICLE XI EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................58

11.1    Executory Contracts and Unexpired Leases Deemed Rejected.................58
11.2    Claims Based on Rejection of Executory Contracts and
        Unexpired Leases.........................................................................................58
11.3    Cure of Defaults for Assumed Executory Contracts and
        Unexpired Leases.........................................................................................59
11.4    Modifications, Amendments, Supplements, Restatements or
        Other Agreements ........................................................................................59
11.5    Reservation of Rights...................................................................................60

ARTICLE XII DISTRIBUTIONS ....................................................................................60

12.1    Distribution Record Date. ............................................................................60
12.2    Date of Distributions....................................................................................60
12.3    Delivery of Distributions .............................................................................60
12.4    Manner of Payment Under the Plan.............................................................61
12.5    Minimum Cash Distributions.......................................................................61
12.6    Setoffs ..........................................................................................................61
12.7    Allocation of Distributions Between Principal and Interest. .......................61
12.8    No Postpetition Interest on Claims ..............................................................61
12.9    No Distribution in Excess of Amount of Allowed Claim............................62

ARTICLE XIII PROCEDURES FOR DISPUTED CLAIMS ...........................................62

13.1    Objections to Claims....................................................................................62
13.2    Estimation of Claims....................................................................................62
13.3    No Distribution Pending Allowance............................................................62

13.4    Resolution of Claims..................................................................................63
13.5    Insured Claims. .......................................................................................63

ARTICLE XIV CONFIRMATION AND CONSUMMATION OF THE PLAN.............63

14.1    Conditions to Confirmation .....................................................................63
14.2    Conditions to Effective Date....................................................................63
14.3    Consequences of Non-Occurrence of Effective Date ...............................65
14.4    Substantial Consummation ......................................................................65
14.5    Effect of Vacatur of Confirmation Order..................................................65

ARTICLE XV ADMINISTRATIVE PROVISIONS ..........................................65

15.1    Retention of Jurisdiction..........................................................................65
15.2    Amendments ...........................................................................................67
15.3    Successors and Assigns............................................................................68
15.4    Governing Law .......................................................................................68
15.5    Corporate Action.....................................................................................68
15.6    Effectuating Documents and Further Transactions....................................68
15.7    Control Provision.....................................................................................68
15.8    Miscellaneous Rules ...............................................................................68
15.9    Notices ...................................................................................................69
15.10   No Admissions or Waiver........................................................................69

**DISCLAIMER**

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.  HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

THE PLAN CONTEMPLATES THE REORGANIZATION OF THE DEBTORS, PAYMENTS TO CERTAIN CREDITORS AND THE ESTABLISHMENT OF A LIQUIDATING TRUST GOVERNED BY THIS PLAN AND THE LIQUIDATING TRUST AGREEMENT.  THE LIQUIDATING TRUST AGREEMENT WILL SET FORTH THE RIGHTS, POWERS, DUTIES AND RESPONSIBILITIES OF THE LIQUIDATING TRUSTEE, AS SUPPLEMENTED BY THE PROVISIONS OF THIS PLAN.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN WHAT IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.  NO REPRESENTATIONS CONCERNING THE DEBTORS, OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.  ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD

NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.    THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(b), AND LOCAL RULE 3017-2, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE V OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THE COMBINED DISCLOSURE STATEMENT AND PLAN.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS (INCLUDING THOSE HOLDERS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## **INTRODUCTION**

Molecular Templates, Inc. and Molecular Templates OpCo, Inc., the debtors and debtors in possession in these Chapter 11 Cases propose the following combined Disclosure Statement and Plan for the reorganization of the Debtors and Distribution of the proceeds of the Estates' remaining assets to the Holders of Allowed Claims against the Debtors as set forth herein. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

This combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of this Plan, and certain other related matters.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION

1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

ARTICLE I
**DEFINED TERMS AND RULES OF INTERPRETATION**

Defined Terms

1.1 "503(b)(9) Claims" means Claims arising under section 503(b)(9) of the Bankruptcy Code Filed against any of the Debtors on or before the General Bar Date.

1.2 "Administrative Agent" means K2 or one of its subsidiaries, in its capacity as administrative agent.

1.3 "Administrative Claim" means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including, (i) Fee Claims and (ii) U.S. Trustee Fees.

1.4 "Administrative Claims Bar Date" means the date that is thirty (30) days following service of notice of the occurrence of the Effective Date.

1.5 "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

1.6 "Allowed" means with respect to any Claim, except as otherwise provided in the Plan: (i) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been Filed; or (ii) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided that with respect to a Claim described in clause (i) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to such Claim, no objection to the allowance thereof has been Filed by the Debtors or any other party in interest within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or such an objection was so Filed and the Claim shall have been Allowed by a final order of the Court. Notwithstanding anything to the contrary herein, no claim of any entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtors. "Allow" and "Allowing" shall have correlative meanings.

1.7 "Amended Schedules Bar Date" means the later of (i) the General Bar Date or the Governmental Bar Date (only if applicable) and (ii) the date that is thirty (30) days following service of notice of an amendment to the Debtors' Schedules.

1.8 "A&R CVR" means that certain Amended and Restated Secured Contingent Value Right Agreement, dated February 20, 2025, which as of the Petition Date is the sum of a principal amount of $24,300,515.15, plus all other amounts accrued but unpaid in

3

connection with the A&R CVR, including, but not limited to, accrued and unpaid interest, unreimbursed costs, fees, expenses, and indemnities owed thereunder.

1.9     "Assumption Schedule" means the schedule of Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Debtors pursuant to the Plan, section 365 of the Bankruptcy Code and Article XI hereof, which will be included in the Plan Supplement, as may be amended, modified or supplemented from time to time in accordance with the Confirmation Order.

1.10     "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent and voidable transfer laws.

1.11     "Ballot" means the form approved by the Bankruptcy Court and distributed to Holders of Claims entitled to vote to accept or reject the Plan.

1.12     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these Chapter 11 Cases.

1.13     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

1.14     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

1.15     "Bar Date" means, with respect to any particular Claim, the applicable date set by the Bankruptcy Court as the last day for filing a proof of claim or a request for allowance of an Administrative Claim or a proof of interest, against the Debtors in these Chapter 11 Cases for the applicable Claim or Interest.

1.16     "Bar Date Motion" means the Motion of Debtors for Entry of an Order (I) Establishing Certain Bar Dates for Filing Proofs of Claim Against the Debtors, and (II) Granting Related Relief, Including Notice and Filing Procedures (D.I. 26).

1.17     "Bar Date Order" means the Order (I) Establishing Certain Bar Dates for Filing Proofs of Claim Against the Debtors, and (II) Granting Related Relief, Including Notice and Filing Procedures (D.I. 69).

1.18     "Bridge Loan" means that certain Loan and Security Agreement, dated February 20, 2025, which as of the Petition Date is the sum of a principal amount of $1,366,231.92 plus all other amounts accrued but unpaid in connection with the Bridge Loan, including, but not limited to, accrued and unpaid interest, unreimbursed costs, fees, expenses, and indemnities owed thereunder.

4

1.19    "BMS" means Bristol Myers Squibb.

1.20    "Business Day" means any day, other than a Saturday, Sunday or a legal holiday (as used in Bankruptcy Rule 9006(a)).

1.21    "Cash" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

1.22    "Causes of Action" means any and all actions, suits, claims for relief, causes of action, Chapter 5 Causes of Action, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims of the Debtors and their Estates against any Person or Entity, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, whether arising prior to or after the Petition Date.  For the avoidance of doubt, the definition of Causes of Action includes, without limitation: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity or (b) the right to object to or otherwise contest Claims or Interests.

1.23    "Chapter 5 Causes of Action" mean any and all actual or potential claims and causes of action arising under Chapter 5 of the Bankruptcy Code, including claims, rights and causes of action arising under sections 544, 545, 547, 548, 549, 550, 551 and 553(b) of the Bankruptcy Code, including but not limited to, the recovery of preferences and fraudulent transfers from any entity that received cash or any other interest in property from any Debtor.

1.24    "Chapter 11 Cases" means the jointly administered cases of the Debtors under chapter 11 of the Bankruptcy Code styled *In re Molecular Templates, Inc.*, *et al.*, Case No. 25-10739 (BLS).

1.25    "Claim" means a claim against any Debtor or Debtors, as such term is defined in section 101(5) of the Bankruptcy Code including, without limitation, any Claim arising after the Petition Date.

1.26    "Claims Agent" means the Debtors' claims agent, Kurtzman Carson Consultants, LLC dba Verita Global ("Verita").

1.27    "Claims Objection Deadline" means one (1) year after the Effective Date, or such later date as may be ordered by the Bankruptcy Court; *provided*, *however*, that the Liquidating Trustee may seek extensions of this date from the Bankruptcy Court.

1.28    "Class" means a group of Claims or Interests described in Article II of this Plan.

1.29    "Collateral Trustee" means Ankura Trust Company, LLC, as collateral trustee for the DIP Secured Parties.

1.30    "Confirmation" means the entry of the Confirmation Order on the docket of these Chapter 11 Cases.

1.31    "Confirmation Date" means the date the Bankruptcy Court enters the Confirmation Order on the docket of these Chapter 11 Cases.

1.32    "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

1.33    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

1.34    "Consummation" means the occurrence of the Effective Date.

1.35    "Cure Obligation" means all obligations required to cure any defaults, to the extent required by section 365 of the Bankruptcy Code, under any Executory Contract or Unexpired Lease that is to be assumed or assumed and assigned by the Debtors pursuant to Article XI hereof and sections 365 and 1123 of the Bankruptcy Code.

1.36    "D&O" means any current or former officer, director or manager of any of the Debtors, solely in his or her capacity as such.

1.37    "D&O Insurance Policy" means all insurance policies (including but not limited to any "tail policy") issued or providing coverage for liabilities against any of the Debtors' D&Os, and all agreements, documents or instruments relating thereto.

1.38    "Debtors" means Molecular Templates, Inc. and Molecular Templates OpCo, Inc.

1.39    "DIP Claims" means Claims arising under or related to the DIP Credit Agreement and pursuant to the Final DIP Order.

1.40    "DIP Credit Agreement" means that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, entered into by the Debtors and the DIP Lender, as the same may be modified, amended or supplemented from time to time, in accordance with the terms thereof.

1.41    "DIP Financing Order" means the Final Order (I) Authorizing Debtors to Obtain Postpetition Financing (II) Granting Security Interests and Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Authorizing the Use of Cash Collateral; and (VI) Granting Related Relief (D.I. 113).

1.42    "DIP Facility" means that certain senior secured superpriority debtor-in-possession term loan credit facility by and between the Debtors and K2 in the aggregate amount of $12 million, which amount consists of (i) new money loan commitments in the aggregate maximum principal amount of up to $3 million, plus (ii) loans representing a "roll up" of a portion of the outstanding Prepetition Secured Claims equal to $9 million.

1.43    "DIP Lender" means K2 HealthVentures LLC and/or one of its subsidiaries, along with its successors and assigns.

1.44    "DIP Secured Parties" means the (i) Collateral Trustee, (ii) Administrative Agent, (iii) DIP Lender, and (iv) any of their respective successors or assigns.

1.45    "Disallowed" means with respect to any Claim or portion thereof, any Claim against any of the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the Debtors or Liquidating Trustee in whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as disputed, contingent, partially liquidated or unliquidated and in respect of which a proof of Claim has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest; (vi) was not timely or properly Filed; (vii) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; and (viii) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550 or 553 of the Bankruptcy Code.  In each case a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, satisfaction, expungement, subordination, or estimation.

1.46    "Disclosure Statement" means the disclosure statement, as amended, supplemented or modified from time to time, that is embodied within this combined Disclosure Statement and Plan and distributed in accordance with, among others, sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3017, Local Rule 3017-2 and other applicable law.

1.47    "Disputed Claim" means any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of this Plan.  For the purposes of this Plan, a Claim shall be considered a Disputed Claim in its entirety before the time that an objection has been or may be filed if: (a) the amount or classification of the Claim specified in a relevant Proof of Claim exceeds the amount or classification of any corresponding Claim scheduled in the Debtors' Schedules of assets and liabilities; (b) any corresponding Claim scheduled by the Debtors has been scheduled as disputed, contingent or unliquidated; or (c) no corresponding Claim has been scheduled by the Debtors in their Schedules of assets and liabilities.

1.48    "Disputed Claims Reserve" means Liquidating Trust Assets allocable to Disputed Claims.

1.49    "Distribution" means the distribution of Cash or other property, as the case may be, in accordance with this Plan in respect of the Holder's Allowed Claim.

1.50    "Distribution Address" means the address for a Holder set forth in a Proof of Claim, as amended or supplemented.  If no Proof of Claim is filed with respect to a particular Claim, such defined term means the address for the Holder set forth in the Debtors' Schedules of assets and liabilities.

1.51 "Distribution Date" means a date or dates, including the Initial Distribution Date, as determined by the Liquidating Trustee when Distributions will be made under the Plan to Holders of Allowed Claims.

1.52 "Distribution Record Date" means the record date for purposes of making Distributions under this Plan on account of Allowed Claims, which shall be the Confirmation Date.

1.53 "Effective Date" means the first date on which all of the conditions of Section 14.2 of the Plan have been satisfied or have been waived in writing.

1.54 "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.55 "Estate" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

1.56 "Exculpated Parties" means collectively, and in each case, in its capacity as such: (i) the Debtors; (ii) the Debtors' directors and officers that have served on or after the Petition Date; (iii) the Debtors' attorneys, financial advisors, consultants, or other professional or advisors; and (iv) solely to the extent they are or are acting as agents for Estate fiduciaries at any time between the Petition Date and the Effective Date, the successors and assigns, subsidiaries, members, employees, partners, officers, directors, agents, attorneys, advisors, accountants, financial advisors, investment bankers, consultants, and other professionals of or for any of the Persons identified in (i) through (iii) above on or after the Petition Date solely in their capacity as such.

1.57 "Executory Contract" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.58 "Fee Claim" means a Claim for compensation or reimbursement of expenses of a Professional pursuant to section 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with the Chapter 11 Cases. "Fee Claim" does not include any Claim for compensation or reimbursement of expenses related to services rendered after the Effective Date by the Liquidating Trustee Professionals.

1.59 "File," "Filed," or "Filing" means, respectively, file, filed or filing with the Bankruptcy Court or Verita in these Chapter 11 Cases.

1.60 "Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Bankruptcy Court, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek review or rehearing or petition for *certiorari* has expired and no timely filed appeal or petition for review, rehearing, remand or *certiorari* is pending, or (b) any appeal taken or petition for *certiorari* filed has been resolved by the highest court to which the order or judgment was appealed or from which *certiorari* was sought; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy

8

Rules or other rules governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.61    "First Day Declaration" means the Declaration of Craig Jalbert in Support of Debtors' Chapter 11 Petitions and First Day Motions (D.I. 15).

1.62    "General Bar Date" means June 30, 2025 at 5:00 p.m. (ET) for each person or entity, other than a Governmental Unit, to file a Proof of Claim in respect of any prepetition Claim against any of the Debtors, including, without limitation, any Secured Claim, General Unsecured Claim, Priority Claim or a Claim asserted under section 503(b)(9) of the Bankruptcy Code for goods delivered and received by any of the Debtors within 20 days before the Petition Date.

1.63    "General Unsecured Claim" means any claim other than an Administrative and Priority Claim, a DIP Claim, an Other Secured Claim, an Other Priority Claim, or a Prepetition Secured Claim.

1.64    "General Unsecured Claims Distribution" shall mean, the cash remaining, if any, following payment in full of all allowed administrative expense claims, including Fee Claims, DIP Claims, priority tax claims, other secured claims, prepetition secured claims, or any other priority claims. Any amount remaining in the wind-down budget, if any, following the winddown of these chapter 11 cases (including the payment of all costs and expenses of the Liquidating Trust, Liquidating Trustee, and the professionals retained by the Liquidating Trust and the Liquidating Trustee) shall be deemed to be cash available for the General Unsecured Claims Distribution

1.65    "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.66    "Government Bar Date" means October 17, 2025 as the deadline by which a Governmental Unit must file a Proof of Claim in respect to a prepetition Claim against any of the Debtors.

1.67    "Holder" or "Holders" means a Person or an Entity holding a Claim or Interest.

1.68    "Impaired" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.69    "Impaired Class" means a Class of Claims or Interests that is Impaired.

1.70    "Initial Distribution" means the first Distribution that the Liquidating Trustee makes to Holders of Allowed Claims.

1.71    "Initial Distribution Date" means the date selected by the Liquidating Trustee which date shall be on or as soon as reasonably practicable after the Effective Date, on which the Liquidating Trustee will make the Initial Distribution.

1.72     "Insider" has the meaning set forth in section 101(31) of the Bankruptcy Code.

1.73     "Intercompany Claims" means a Claim by a Debtor against another Debtor or its direct or indirect subsidiary or affiliate.

1.74     "Intercompany Interest" means an Interest held by a Debtor or a direct or indirect subsidiary or affiliate of a Debtor in another Debtor or a direct or indirect subsidiary or affiliate of a Debtor.

1.75     "Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors.

1.76     "Interim Approval and Procedures Order" means the Order (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Disclosure Statement and Plan; (III) Approving the Form of Ballots and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Disclosures in, and Confirmation of, the Combined Disclosure Statement and Plan; and (VI) Granting Related Relief (D.I. 96).

1.77     "Interim Compensation Procedures Order" means the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (D.I. 96).

1.78     "K2" means K2 HealthVentures, LLC.

1.79     "Lien" means: (a) a judicial lien as defined in section 101(36) of the Bankruptcy Code; (b) a lien as defined in section 101(37) of the Bankruptcy Code; (c) a security interest as defined in section 101(51) of the Bankruptcy Code; (d) a statutory lien as defined in section 101(53) of the Bankruptcy Code; and (e) any other lien, interest, charge or encumbrance.

1.80     "Liquidating Trust" means that certain trust established pursuant to Article IX hereof and the Liquidating Trust Agreement to, among other things, hold and, as applicable, monetize the General Unsecured Claims Distribution (including though the assertion of the Avoidance Actions), make Distributions to Holders of Allowed Claims pursuant to this Plan and wind-down the Debtors' estates after the Effective Date.

1.81     "Liquidating Trust Agreement" means the trust agreement to be filed as part of the Plan Supplement, which will, among other things: (a) establish and govern the Liquidating Trust; (b) set forth the respective powers, duties and responsibilities of the Liquidating Trustee; and (c) provide for Distributions to Holders of Allowed Claims in accordance with Article XII hereof.

1.82    "Liquidating Trust Assets" means the General Unsecured Claims Distribution, the Avoidance Actions, the Wind-Down Budget, and such other amounts as are necessary to fund distributions on account of Allowed Other Secured Claims, Allowed Priority Claims, and Allowed Administrative Claims.

1.83    "Liquidating Trust Expenses" means any and all reasonable fees, costs and expenses incurred by the Liquidating Trust or the Liquidating Trustee (or any professional or other Person retained by the Liquidating Trustee) on or after the Effective Date in connection with any of their duties under the Plan and the Liquidating Trust Agreement, including any administrative fees, attorneys' fees and expenses, insurance fees, taxes and escrow expenses.

1.84    "Liquidating Trustee" means the person or entity who will be appointed as of the Effective Date as trustee of the Liquidating Trust and shall be responsible for the duties, powers, and affairs of the Liquidating Trust in accordance with the Liquidating Trust Agreement.

1.85    "Liquidating Trustee Professionals" means the agents, financial advisors, attorneys, consultants, independent contractors, representatives and other professionals retained by the Liquidating Trustee (in their capacities as such).

1.86    "Local Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.87    "Molecular Templates" means Debtor Molecular Templates, Inc.

1.88    "Molecular Templates OpCo" means Debtor Molecular Templates OpCo, Inc.

1.89    "Objection" means any objection, application, motion, complaint or any other legal action seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, establish the priority of, expunge, subordinate or estimate any Claim (including any objection or opposition to any request for allowance or payment of any Administrative Claim).

1.90    "Other Priority Claim" means a Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.91    "Other Secured Claim" means any Claim against a Debtor where, pursuant to section 506(a) of the Bankruptcy Code, the Claim is secured by a valid, perfected, and enforceable Lien that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law in or upon any right, title, or interest of the Debtor in and to property of the Estate, to the extent of the value of the Debtor's interest in such property as of the relevant determination date.

1.92    "Person" is defined in section 101(41) of the Bankruptcy Code.

1.93    "Petition Date" means April 20, 2025, the date the Debtors commenced these Chapter 11 Cases in the Bankruptcy Court.

11

1.94    "Plan" means this plan of reorganization under chapter 11 of the Bankruptcy Code, together with any amendments or modifications hereto as the Debtors may file hereafter in accordance with the terms of this Plan.

1.95    "Plan Documents" means the documents, other than this Plan, to be executed, delivered, assumed or performed in connection with the Consummation of this Plan, including, without limitation, the documents to be included in the Plan Supplement and any and all exhibits to the Plan and the Disclosure Statement.

1.96    "Plan Supplement" means the supplemental appendix to this Plan, filed with the Bankruptcy Court not less than seven (7) calendar days prior to the Voting Deadline, which contains, among other things: (a) draft forms or signed copies, as the case may be, of the Liquidating Trust Agreement; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases, if any; and (c) any schedules, lists or documents that supplement or clarify aspects of this Plan and are identified as part of the Plan Supplement.

1.97    "Prepetition Secured Claims" means, in the aggregate, the Bridge Loan and the A&R CVR.

1.98    "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

1.99    "Professional" or collectively "Professionals," means any professional Person or Entity employed in these Chapter 11 Cases by Bankruptcy Court order pursuant to sections 327, 328, or 363 of the Bankruptcy Code.

1.100    "Professional Fees Account" shall mean the professional fee escrow account which has been funded by the Debtors in accordance with the DIP Financing Order and/or will be additionally funded, to the extent necessary, pursuant to section 6.2 of the Plan for the purpose of payment of Allowed Fee Claims.  For the avoidance of doubt, the Professional Fees Account, and all funds held therein, are (and shall be deemed) held in trust exclusively for the benefit of the Professionals, and shall be available only to satisfy Allowed Fee Claims (to the extent unpaid). Any remaining funds in the Professional Fees Account from and after final allowance and payment in full of all Allowed Fee Claims shall revert to the Debtors' estates for payment in accordance with this Plan.

1.101    "Proof of Claim" means a proof of Claim filed against any of the Debtors in these Chapter 11 Cases.

1.102    "Rejection Damages Bar Date" means the later of (i) the General Bar Date or the Government Bar Date (only if applicable) and (ii) the date that is thirty (30) days following service of an order approving rejection of an Executory Contract or Unexpired Lease.

1.103    "Related Party" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing

12

body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such person's or entity's respective heirs, executors, estates, and nominees.

1.104   "Released Party" means, each of, and in each case in its capacity as such: (i) the Debtors and each of the Debtors' Estates; (ii) the DIP Secured Parties; (iii) any other Releasing Party; (iv) each current and former Affiliate of each entity in clauses (i) through clause (iii); and (v) each Related Party of each entity in clauses (i) through clause (iii); provided, that, in each case, an entity shall not be a Released Party if it: (a) elects to opt out of the releases provided by the Plan, (b) is deemed to reject the Plan, or (c) timely objects to the releases provided by the Plan through a formal objection filed on the docket of these Cases that is not resolved before the hearing on confirmation of the Plan.  Notwithstanding the foregoing, any party who is a Released Party shall also be a Releasing Party and any party who is a Releasing Party shall also be a Released Party.

1.105   "Releasing Party" means each of, and in each case in its capacity as such: (i) the Debtors and each of the Debtors' Estates; (ii) the DIP Secured Parties; (iii) all holders of claims that vote to accept the Plan and do not opt out of the voluntary release contained in Section 10.7 of the Plan by checking the "opt out box" on the ballot and returning it in accordance with the instructions set forth thereon; (iv) all holders of claims that are deemed to accept the Plan and who do not affirmatively execute and timely return a release opt-out form; (v) all holders of claims whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan and do not opt out of the voluntary release contained in Section 10.7 of the Plan by checking the "opt out box" on the ballot and returning it in accordance with the instructions set forth thereon; (vi) all holders of claims that vote to reject the Plan and do not opt out of the voluntary release contained in Section 10.7 of the Plan by checking the "opt out box" on the ballot and returning it in accordance with the instructions set forth thereon; and (vii) each Related Party of each Entity in clauses (i) through clause (vi) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (i) through clause (vi); provided, that, in each case, an entity shall not be a Releasing Party if it:  (a) elects to opt out of the third party release; (b) is deemed to reject the Plan, or (c) timely objects to the third party release through a formal objection filed on the docket of the Cases that is not resolved before the hearing on confirmation of the Plan. Notwithstanding the foregoing, any party who is a Released Party shall also be a Releasing Party and any party who is a Releasing Party shall also be a Released Party.

1.106   "RSA Term Sheet" means that certain Restructuring Support Agreement Term Sheet, attached as Schedule 2 to the First Day Declaration.

1.107   "Restructuring Transaction" means any means, any undertaking, or action as may be necessary or appropriate to effectuate the transactions set forth in the RSA Term

13

Sheet, including but not limited to: (1) the Debt-for-Equity Transaction; and (2) the Wind-down, all as may be more fully described in Article IX herein.

1.108 "Retained Assets" means all assets of the Debtors and the Estates, including, but not limited to: (a) all of the Debtors' Cash; (b) all Retained Causes of Action other than the Avoidance Actions; (c) all rights of setoff, recoupment, and other defenses against Claims; (d) all of the Debtors' bank accounts; (e) all documents, communications and information, without regard to whether such documents, communications and information are subject to the attorney-client privilege; and (f) any other assets and any proceeds realized or received from such assets, all of which are transferred to K2 as part of the Debt-for-Equity Transaction, on the Effective Date except as may be necessary to fund distributions under this Plan.

1.109 "Retained Causes of Action" means any and all Causes of Action as of the Effective Date, whether direct or derivative, that are not waived, released, compromised or settled pursuant to this Plan or a Bankruptcy Court order, which shall vest in the Liquidating Trust.

1.110 "Schedules" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

1.111 "Secured Claim" means, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or nonbankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estate, to the extent of the value of the holder's interest in such property as of the relevant determination date, or (b) Allowed as such pursuant to the terms of this Plan (subject to the Confirmation Order becoming a Final Order). The defined term Secured Claim includes any Claim that is (a) subject to an offset right under applicable law as of the Petition Date, and (b) a secured claim against the Debtors pursuant to sections 506(a) and 553 of the Bankruptcy Code.

1.112 "Solicitation Materials" means all solicitation materials with respect to the Plan, including the Disclosure Statement and related Ballots, which have been approved by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

1.113 "Tax Claim" means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.114 "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.115 "Unimpaired" means, when used in reference to a Claim, any Claim that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.116 "U.S. Trustee" means the United States Trustee for Region 3.

14

1.117    "U.S. Trustee Fees" mean fees payable pursuant to 28 U.S.C. § 1930, to the extent applicable to these Chapter 11 Cases.

1.118    "Voting Class" means a Class whose members are entitled to vote on this Plan.

1.119    "Voting Deadline" shall mean June 24, 2025 at 4:00 p.m. (Prevailing Eastern Time), the date specified in the Disclosure Statement, the Ballots, the Opt-Out Election Form, the Interim Approval and Procedures Order or related Solicitation Materials approved by the Bankruptcy Court as the last date for Holders of Claims entitled to vote on this Plan to submit their ballots with respect to this Plan, as such date may be extended.

1.120    "Wind-down Budget" means the budget to be agreed as between K2 and the Debtors to fund the wind-down of the non-reorganized portion of the Debtors' estates.

Rules of Interpretation

1.121    Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection or clause contained therein, unless the context requires otherwise. The words "include" and "including" shall mean "include, without limitation," or "including," as the case may be.  Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural.  Any term that is not otherwise defined herein, but used in the Bankruptcy Code or the Bankruptcy Rules, is used as defined in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  Further, captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Disclosure Statement and Plan,

1.122    Any reference in this Plan to a contract, instrument, release, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified or supplemented.  Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, release, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with federal law, including the Bankruptcy Code and Bankruptcy Rules.

1.123    The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to any entity as a holder of a Claim or Interest includes that entity's successors and assigns.

1.124    In the event of an inconsistency between the Plan and any other document, the terms of the Plan shall control (unless expressly stated otherwise herein or in such other document). The provisions of the Plan and the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that if there is

determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order or the Liquidating Trust Agreement that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order or the Liquidating Trust Agreement, as applicable, shall govern and any such provision of the Confirmation Order or the Liquidating Trust Agreement, as applicable, shall be deemed a modification of the Plan and shall control and take precedence.

Appendices and Plan Documents

1.125    All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. The following document shall be provided by the Debtors for filing as part of the Plan Supplement: draft forms or signed copies, as the case may be, of the Liquidating Trust Agreement. Copies of the Plan Documents are available free of charge at https://www.veritaglobal.net/MolecularTemplates.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.

2.1  General Rules of Classification. The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, confirmation of the Plan and making Distributions in accordance with the Plan in respect of Allowed Claims against the Debtors under the Plan.[2]  Notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon and will not cause the substantive consolidation of any of the Debtors or their Estates, *provided*, *however*, that for purposes of voting and distribution under the Plan, the Estates shall be deemed merged and consolidated, and treated as a single Estate. A Holder of an Allowed Claim against more than one Debtor on a theory of joint and several liability shall only be entitled to a single recovery in distribution. For brevity and convenience, the classification and treatment of Claims and Interests have been arranged into one table set below in this section. Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities or cause the

---

[2]    For the avoidance of doubt, all Interests in the Debtors will be deemed immediately and automatically cancelled as of the Effective Date as set forth in Section 9.20 herein, and Holders of Interests in the Debtors shall not be entitled to any recovery or Distributions from (whether from the Debtors or the Liquidating Trust) under this Plan; *provided*, *however*, that this cancellation shall not apply to the equity interest of Molecular Templates, Inc. in its subsidiary and affiliated debtor Molecular Templates OpCo, Inc.

16

transfer of any assets.  Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including the claims reconciliation process.  Actual recoveries may vary widely within these ranges, and without any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and the actual Distributions received by creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the combined Disclosure Statement and Plan, the Debtors emphasize that they make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is (or later becomes, consistent with the Plan) an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims, Fee Claims, DIP Claims, and Tax Claims, are placed in the Classes set forth below.  The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class/ Designation | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| Class 1: Other Secured Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Other Secured Claim and the Debtors agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Secured Claim, each holder thereof shall receive, at the option of the Debtors, as applicable: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) reinstatement of such holder's Allowed Other Secured Claim; (iii) such other | Unimpaired Not entitled to vote Deemed to accept Plan | 100% | TBD |

17

| Class/ Designation | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| | treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim. | | | |
| Class 2: Other Priority Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Other Priority Claim and the Debtors agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Priority Claim, each holder thereof shall receive Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim. | Unimpaired Not entitled to vote Deemed to accept Plan | 100% | TBD |

18

| Class/ Designation | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| Class 3:\n\nPrepetition Secured Claims | On the Effective Date, the Prepetition Secured Claims shall be deemed Allowed in the full aggregate principal amount of $16,329,989.48, plus any and all accrued and unpaid interest, unreimbursed costs, fees, expenses, and indemnities owed thereunder. The Prepetition Secured Claims shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of $15,000,000 of such Prepetition Secured Claim, 100% of the New MTEM Common Equity, subject to dilution on account of any distribution of New MTEM Common Equity on account of and in satisfaction of any additional portion of the Prepetition Secured Claims or for the DIP Facility. | Impaired\n\nEntitled to vote | $15,000,000 | $16,329,989.48 |
| Class 4:\n\nGeneral Unsecured Claims | In full and final satisfaction of the General Unsecured Claims, each holder shall receive its pro rata share of (i) the proceeds, if any, from the prosecution of the Avoidance Actions; and (ii) the General Unsecured Claims Distribution. | Impaired\n\nEntitled to vote | 1-5% | $3,750,000 |
| Class 5:\n\nIntercompany Claims | On the Effective Date, all intercompany claims shall be released without any distribution on account of such claims. | Impaired\n\nNot entitled to vote\n\nDeemed to reject Plan | 0% | N/A |

| Class/ Designation | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| Class 6: Existing Equity Interests | On the Effective Date, the existing Interests of the Debtors shall be deemed canceled, extinguished and discharged and of no further force or effect, and the Holders of such Interests shall not be entitled to receive or retain any property on account of such Interests; *provided, however*, that this cancellation shall not apply to the equity interest of Molecular Templates, Inc. in its subsidiary and affiliated debtor Molecular Templates OpCo, Inc. | Impaired<br><br>Not entitled to vote<br><br>Deemed to reject Plan | 0% | N/A |

2.2     Unimpaired Classes of Claims.

Class 1: Other Secured Claims.  Class 1 shall consist of Other Secured Claims against the Debtors.  Class 1 Claims are Unimpaired by the Plan and the Holders of Allowed Class 1 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

Class 2: Other Priority Claims.  Class 2 shall consist of Other Priority Claims against the Debtors.  Class 2 Claims are Unimpaired by the Plan and the Holders of Allowed Class 2 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

2.3     Impaired Classes of Claims.

Class 3: Prepetition Secured Claims.  Class 3 shall consist of all Prepetition Secured Claims against the Debtors.  The Class 3 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

Class 4: General Unsecured Claims.  Class 4 shall consist of all General Unsecured Claims. The Class 4 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

Class 5: Intercompany Claims.  Class 5 shall consist of all Intercompany Claims. Because Holders of Class 5 Intercompany Claims will receive no Distribution under the Plan, Holders of Class 5 Intercompany Claims are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

2.4     Impaired Class of Interests.

Class 6: Interests.  Class 6 shall consist of all Interests.  Because Holders of Class 6 Interests will receive no Distribution under the Plan, Holders of Class 6 Interests are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

ARTICLE III
**BACKGROUND AND DISCLOSURES**

3.1     General Background.

a)  *The Debtors' Businesses.*

Molecular Templates was a clinical-stage biopharmaceutical company founded in 2001 that focused on discovering and developing novel, targeted biologic therapeutics.  Founded originally as a private company in 2001, Molecular Templates was a publicly traded company with its shares listed on the Nasdaq Global Select Market (ticker symbol: MTEM) from 2017 to 2024.[3] Molecular Templates was and continues to be a corporation organized under the laws of the State of Delaware.  Historically, Molecular Templates maintained its headquarters and main research facilities at 9301 Amberglen Blvd., Suite 100, Austin, TX 78729.  Presently, since the vacating of the Debtors' previous headquarters location as of the Petition Date, the Debtors' address is c/o Verdolino & Lowey, P.C., 124 Washington Street, Suite 101, Foxboro, MA 02035.

Molecular Templates specialized in developing proprietary "engineered toxin bodies" ("ETBs"), a next-generation biologic platform designed to treat cancer and other diseases. The ETBs that Molecular Templates developed targeted cancer in unique ways with the potential to overcome tumor resistance mechanisms.  Molecular Templates advanced several promising programs at various stages of development, including MT-0169, (an ETB targeting the CD38 protein on myeloma cells), MT-6402 (an ETB targeting immunosuppressive cells expressing PD-L1 in the tumor microenvironment), and MT-8421 (an ETB targeting immunosuppressive cells expressing CTLA-4 in the tumor microenvironment) for clinical trials.  In early clinical studies, these ETBs showed clinical benefit (*i.e.*, induced remission or halted disease progression) in cancer patients who had exhausted all other treatment options.  Since their inception, the Molecular Templates devoted substantially all of their resources to building their proprietary biologic platform and advancing development of their portfolio of programs.

Despite several attempts in recent years to raise additional capital and to sell some or all of its assets out of court through a value-maximizing sale, the Debtors were unable to secure enough financing or raise enough capital in order to continue as a going-concern.  As biotechnology equity markets continued to erode in the post-COVID-19 pandemic, the Debtors were unable to keep up with the cash-intensive needs of developing their drug products while

---

[3]     MTEM was delisted from the Nasdaq Global Select Market on December 26, 2024, and, through this Plan, all outstanding equity Interests (including all publicly traded shares of common stock) in Molecular Templates will be cancelled as of the Effective Date; *provided*, *however*, that for the avoidance of doubt, this cancellation shall not apply to the non-publicly traded equity interest of Molecular Templates, Inc. in its subsidiary and affiliated debtor Molecular Templates OpCo, Inc.

21

continuing to fulfil its operating costs.  The Debtors thus turned to discussions with K2, their prepetition secured lender, to effectuate an orderly wind-down of the company through a chapter 11 plan process.

A more detailed summary of the Debtors' development portfolio can be found in the First Day Declaration and the Debtors' most recent Annual Report on Form 10-K, filed on March 29, 2024, and in its most recent Quarterly Reports on Form 10-Q filed on May 15, 2024 and August 14, 2024.

b)  *The Debtors' Prepetition Corporate and Capital Structure.*

### i.  Corporate Structure

Debtor Molecular Templates, Inc. is the parent company and owns 100% of the interests in Debtor Molecular Templates OpCo, Inc.  Debtor Molecular Templates, Inc. also owns a 100% interest in non-debtor THLD Enterprise (UK) Limited ("Threshold UK"). Threshold UK is a non-operating wholly owned subsidiary that was inherited as a result of a reverse merger transaction completed on March 16, 2017, through which the Debtors acquired Threshold Pharmaceuticals, Inc. and became a publicly listed company.  Threshold UK has no known creditors and does not currently hold any assets.

### ii.  A&R CVR Obligations and Bridge Loan

On June 16, 2023, the Debtors entered into the A&R CVR which fully discharged the Debtors' outstanding loan obligations under a previous loan and security agreement with K2 (the "K2 Initial Loan"), in exchange for: (1) an aggregate repayment in cash of $27.5 million, (2) the granting of a "contingent value right" to K2, and (3) the issuance of a warrant to purchase shares of common stock to an affiliate of K2.  The contingent value rights require payments to K2 if certain specified events occur, as defined in the A&R CVR.  The payment due upon any such event occurring was capped at an initial amount of approximately $10,000,000, which can increase, based on a set formula, to a maximum payment obligation of approximately $26,000,000 (the "Remaining Value").  In addition, to protect its interest in any potential payment of the Remaining Value, K2 was granted a senior security interest in substantially all of the Debtors' assets.  As of the Petition Date, the Debtors had approximately $24,300,515.15 in Remaining Value obligations.

On February 20, 2025, the Debtors entered into the Bridge Loan with K2 to provide the Debtors with approximately $560,000 worth of liquidity secured by substantially all of the Debtors' assets.  The Bridge Loan has a maturity date of April 21, 2025 and bears interest at a fixed annual rate of 13.5%.  As of the Petition Date, the Debtors had just over $1,366,231.92 in principal plus fees and interest owing on the Bridge Loan.

### iii.  Trade and Miscellaneous Unsecured Debt

In addition to the Debtors' secured debt, the Debtors estimate that, as of the Petition Date, they had approximately $3,750,000 in unpaid trade and other ordinary course obligations.

### *iv.*    *Equity*

As stated above, Molecular Templates was a publicly traded company with its shares listed on the Nasdaq Global Select Market (ticker symbol: MTEM).  The authorized capital stock of Molecular Templates consists solely of: (i) 150,000,000 shares of common stock, par value $0.001 per share (the "Shares"), and (ii) 2,000,000 shares of preferred stock, par value $0.001 per share (the "Preferred Shares"). As of June 30, 2024, 6,583,880 Shares were outstanding, and 250 Preferred Shares were outstanding.

### 3.2    Events Leading to Chapter 11.

As an early-stage biotech company, the Debtors incurred losses each year since their inception, with the exception of the first quarter of 2023 and the first quarter of 2024.  The Debtors devoted almost all of their financial resources to research and development, including preclinical development activities and preparing for and conducting clinical trials of their product candidates.  The total costs to advance any of the Debtors' product candidates to marketing approval in even a single jurisdiction was substantial and difficult to accurately predict.  Because of the numerous risks and uncertainties associated with the development of drug products, the Debtors were unable to accurately predict the timing or amount of increased expenses or when, or if, the Debtors would be able to begin generating revenue from the commercialization of their products or achieve or maintain profitability.

Despite management's best efforts to stabilize operations, the Debtors' business prospects steadily and significantly declined in the post-COVID-19 pandemic period, as biotechnology equity markets continued to erode.  Access to capital for biotechnology companies in general, and the Debtors in particular, became substantially more difficult in the post-COVID-19 pandemic period.  Although clinical results across the Debtors' pipeline were generally positive, the results were early and did not show overwhelming signs of clinical efficacy.  At the same time, the Debtors' continual need for significant cash resources to execute their business plan and advance clinical development of their pipeline candidates asserted liquidity pressure on the company's operations.

The Debtors' ability to execute their business plan and advance clinical development of pipeline candidates was further exacerbated by a confluence of systemic factors as well, including: (1) rising interest rates; (2) a general reduction in the valuation of publicly-traded biotechnology companies (particularly early-stage oncology-focused companies) in the post-COVID-19 period; (3) the cash-intensive nature of developing pipeline clinical candidates in the oncology space; and (4) uncertainty around the 2024 presidential election that created, among other things, an increasingly uncertain regulatory environment.

As a result of the circumstances described above, in March 2023, the Debtors began to downsize their operations, re-focusing and re-prioritizing their slate of programs in light of the adverse economic headwinds the Debtors were facing.  To bring down costs, the Debtors started by reducing their workforce by 50%, from 222 employees to 111 employees.  On the clinical side of their work, the Debtors discontinued the development of MT-511, a drug candidate targeting

the HER2 receptor,[4] and narrowed their focus to their clinical-phase PD-L1, CTLA-4 and CD38 candidates.  On the preclinical side of the Debtors' work, the company pivoted to focusing on its ongoing collaborations, especially with Bristol Myers Squibb ("BMS").

Despite these internal reorganizations, the company continued to experience adverse circumstances and liquidity pressures.  For example, in April 2023, MTEM's CD38-directed cancer candidate was hit by a two-month-long FDA hold that only lifted at the start of June 2023.  A year later, BMS terminated its multi-year pre-clinical collaboration with the Debtors, which was a major source of funding and business development for the Debtors.[5]  This further diminished the Debtors' standing and eroded their access to capital.

As a result, the Debtors continued to scale back its workforce.  In June 2023, the Debtors further reduced their workforce by an additional 44%.  By April 11, 2024, the Debtors had to further reduce their workforce by approximately 30%.  By the end of 2024, the Debtors' cash on hand became insufficient to meet the Debtors' ongoing operational needs.

In tandem with the Debtors' internal reorganizations and re-prioritizations, starting in the first quarter of 2023, the Debtors began the first of several rounds of marketing their assets and exploring strategic alternatives.  In March 2023, the Debtors engaged Stifel Nicolaus, an investment banking firm, to initiate a comprehensive evaluation of all strategic alternatives available to the Debtors, including a sale and marketing process for the Debtors' assets.  Stifel Nicolaus contacted over 30 parties. Of these parties, one potential purchaser expressed interest in the Debtors' assets, and subsequently signed a confidentiality agreement, and was granted access to a data room.  Overall, this initial prepetition marketing process spanned approximately twelve months.  However, despite this extended period of diligence and negotiations, the Debtors were unable to identify a viable purchaser.

In mid-2024, the company retained Oppenheimer & Co. ("Oppenheimer"), another investment bank, to further explore strategic alternatives and/or raise additional capital.  However, Oppenheimer was similarly unable to raise additional capital or sell any of the Debtors' assets.  Most recently, the Debtors retained the services of Rock Creek Advisors ("Rock Creek") in 2024 as part of a sale process, but this third round of marketing also did not yield any buyers.  In mid-March 2025, an online auction was run by the Branford Group for the sale of various miscellaneous specialized lab and good manufacturing practice ("GMP") equipment for the biotechnology and pharmaceutical industries.  A number of different buyers closed sales on this equipment, which netted approximately $1.2 million of proceeds.  A number of different buyers closed sales on this

---

[4]   A HER2 receptor is a protein that is found on the service of certain cells, particularly in certain types of cancers, like breast cancer.  It is part of a larger family of receptors called epidermal growth factor receptors (EGFR) that play a role in regulating cell growth, survival, and differentiation.

[5]   In February 2021, the Debtors entered into a collaboration with BMS, pursuant to which BMS committed up to $1.3 billion, with $70 million paid upfront to the Debtors, to develop novel ETBs in collaboration with the Debtors.  Pursuant to the agreement, Molecular Templates conducted research activities for the discovery of ETBs for multiple targets selected by BMS.  BMS received the option to obtain an exclusive worldwide license to develop and commercialize ETBs directed to each selected target.

equipment, which netted approximately $1.2 million of proceeds.  The sold equipment, and the proceeds resulting therefrom, were subject to K2's liens, and the net proceeds were paid to K2.

By the end of 2024, the Debtors' board began to move towards a dissolution under state law.  On December 31, 2024, the Debtors terminated their existing employees and their entire existing board resigned, appointing Craig Jalbert in their place as the sole director, chief executive officer, and president of the Debtors to shepherd the Debtors through an orderly dissolution.  In the beginning of 2025, discussions began to take place between the Debtors and K2 to discuss potential value-maximizing alternatives to a state law dissolution, including the potential funding of a chapter 11 plan process by K2.  After several weeks of negotiations, and after considering a number of different wind-down alternatives, the Debtors, at the direction of Mr. Jalbert, began to outline a comprehensive restructuring support agreement with K2 (the "RSA") that would restructure the Debtors' existing debt and effectuate a debt-for-equity transaction as part of a chapter 11 process.

With the Debtors projected to be left with only approximately $121,000 of cash and cash equivalents as of March 12, 2025, K2 agreed to provide the Debtors with the Bridge Loan to fund preparation for filing these Chapter 11 Cases.  In connection with this preparation, the Debtors retained the following advisors to assist the Debtors: Morris, Nichols, Arsht & Tunnell LLP as bankruptcy counsel; Rock Creek Advisors as financial and restructuring advisor; and Lowenstein Sandler LLP as tax and securities counsel in connection with the Debtors' restructuring efforts.

In April 2025, the Debtors subsequently entered into the RSA Term Sheet to outline the details of the chapter 11 plan process, including the provision of debtor-in-possession financing, and agreement on a plan structure that included a debt-for-equity swap for K2.  As part of the RSA Term Sheet, the Debtors also entered into a $12 million senior secured debtor-in-possession financing facility in order to fund this chapter 11 plan process.

3.3     The Chapter 11 Cases.

a)  *Generally.*

On April 20, 2025—the Petition Date—the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of that date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  Since the Petition Date, the Debtors have continued to operate their business as debtors and debtors in possession.  By order entered on April 22, 2025 (D.I. 34), the Chapter 11 Cases are jointly administered for procedural purposes only.  No trustee, examiner or unsecured creditors' committee has been appointed in the Chapter 11 Cases.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors.  With certain limited exceptions and/or modifications as

permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan.

b) *"First Day" Motions and Related Applications.*

On the Petition Date, the Debtors filed a number of "first-day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets and minimize the effects of the commencement of these Chapter 11 Cases. On April 22, 2025, the Bankruptcy Court entered orders providing various first-day relief, including interim or final orders approving:

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Their Bank Accounts and Existing Business Forms, and (D) Implement Changes to the Existing Cash Management System as Necessary, and (E) Continue Ordinary Course Intercompany Transactions, (II) Waiving the Requirements of 11 U.S.C. § 345(b) and the U.S. Trustee's Operating Guidelines, and (III) Granting Related Relief* (D.I. 5);

- *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Insurance Program and Pay All Obligations with Respect Thereto, and (II) Granting Related Relief* (D.I. 11);

- *Motion of Debtors for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for, and Approving Restrictions on, Certain Transfers of, and Declarations of Worthlessness with Respect to, Interests in the Debtors' Estates* (D.I. 12);

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (II) Granting Related Relief* (D.I. 10);

- *Debtors' Motion for Interim and Final Order (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors and (II) Granting Related Relief* (D.I. 6);

- *Debtors' Application for Authorization to Employ and Retain Kurtzman Carson Consultants, LLC dba Verita Global as Claims and Noticing Agent Effective as of the Petition Date* (D.I. 17);

- *Debtors' Motion for Entry of an Order Authorizing the Joint Administration of Debtors' Chapter 11 Cases* (D.I. 3);

- *Motion of Debtors for Entry of Interim and Final Orders: (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (B) File a Consolidated*

*List of the Debtors' Thirty Largest Unsecured Creditors, and (C) Redact Certain Personally Identifiable Information, and (II) Granting Related Relief* (D.I. 13); and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Lender, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. 14).

c) *Retention of Professional Advisors.*

On April 21, 2025, the Debtors filed an application to retain Kurtzman Carson Consultants, LLC dba Verita Global ("Verita") as claims and noticing agent for the Debtors.

The Debtors intend to file applications to retain and employ the following professionals: (1) Morris, Nichols, Arsht & Tunnell LLP ("MNAT"), as bankruptcy counsel to the Debtors; (2) Verita, as administrative agent to the Debtors, (3) Rock Creek as financial advisor to the Debtors; and (4) Lowenstein Sandler LLP as tax and securities counsel.  The Debtors further intend to file: (i) a motion to establish procedures for interim compensation and reimbursement of expenses for all retained professionals and (ii) a motion to retain and compensate various attorneys and other professionals utilized by the Debtors in a variety of matters unrelated to the Chapter 11 Cases in the ordinary course of business, subject to certain procedures.

d) *Rejection of Executory Contracts and Unexpired Leases and Abandonment of Burdensome Assets*

On the Petition Date, the Debtors filed a motion to reject, effective as of the Petition Date, certain unexpired leases of nonresidential real property that the Debtors have determined they no longer require. Further, the Debtors requested authority to abandon any property remaining at the leased premises.

As further discussed herein, to the extent not assumed and assigned by separate order of the Court, the Plan provides for the rejection of any remaining unexpired nonresidential leases and executory contracts pursuant to section 365 of the Bankruptcy Code in accordance with the terms of the Plan.

e) *Bar Dates Pursuant to the Bar Date Order.*

On the Petition Date, the Debtors filed a motion (the "Bar Date Motion") seeking entry of an order establishing certain bar dates (together, the "Bar Dates") for filing proofs of claim against the Debtors. Specifically, the Debtors request the establishment of the following Bar Dates:

(1) General Bar Date: Establishing 5:00 p.m. prevailing Eastern Time on the date that is thirty (30) days from service of the notice of the bar date (the "Bar Date Notice") as the deadline (the "General Bar Date") for each person or entity, other than a governmental unit, to file a proof of claim in respect of any prepetition claim against any of the Debtors, including,

27

without limitation, any secured claim, unsecured claim, priority claim, claim asserted under section 503(b)(9) of the Bankruptcy Code for goods delivered and received by any of the Debtors within 20 days of the Petition Date, unless otherwise provided in this Motion;

(2)    Governmental Bar Date: October 17, 2025, as the deadline for Governmental Units to file a proof of claim in respect of a prepetition claim against the Debtors (the "Governmental Bar Date");

(3)    Amended Schedules Bar Date: the later of (i) the General Bar Date of the Governmental Bar Date (only if applicable) and (ii) the date that is thirty (30) days following service of notice of an amendment to the Debtors' Schedules for an entity whose claim is affected by such amendment to file, amend or supplement a proof of claim with respect to such claim, provided that any amendment to the Schedules to include the intercompany amount owed among the Debtor entities shall not extend the General Bar Date; and

(4)    Rejection Damages Bar Date: the later of (i) the General Bar Date or the Government Bar Date (only if applicable) and (ii) the date that is thirty (30) days following service of an order approving rejection of an Executory Contract or Unexpired Lease of the Debtors as the deadline by which an entity asserting a claim for damages against any of the Debtors arising from such rejection must file a proof of claim on account of such damages.

f)    *Reorganization and Wind-Down of Chapter 11 Cases.*

Following the consummation of the Plan, the Debtors shall be reorganized. As previously discussed, the Debtors currently have three clinical-phase drug candidates in development. Following reorganization, the DIP Lender intends to maintain these drug candidates in the hope that they may be commercialized in the future. Additionally, the Debtors are party to a contract with ImmunoGenesis, Inc., and the contract contains conditional milestones that, if achieved, may result in royalty payments for the Debtors. The Debtors discontinued the development of MT-511, a drug candidate targeting the HER2 receptor, and narrowed their focus to their clinical-phase PD-L1, CTLA-4 and CD38 candidates. The Debtors intend to assume this contract in order to preserve the potential for royalty payments.

Additionally, the Liquidating Trustee shall be focused principally on winding down these Chapter 11 Cases. The Debtors' Retained Assets currently consist of proceeds of the Debtors' remaining cash on hand after the satisfaction of the DIP Facility and various administrative expenses and all other Retained Causes of Action. This Plan provides for the Debtors' Retained Assets to be distributed to Holders of Allowed Claims in accordance with the terms of the Plan.

28

ARTICLE IV
**CONFIRMATION AND VOTING PROCEDURES**

4.1     Confirmation Procedure.

On May 27, 2025, the Bankruptcy Court entered the Interim Approval and Procedures Order conditionally approving the combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled for July 1, 2025 at 10:00 a.m. (prevailing Eastern Time) to consider (a) final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

4.2     Procedure for Objections.

Any objection to final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (a) counsel for the Debtors, Morris, Nichols, Arsht & Tunnell LLP, 1201 Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Eric D. Schwartz, Esq. (eschwartz@morrisnichols.com) and Andrew R. Remming, Esq. (aremming@morrisnichols.com); and (b) the U.S. Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Jane M. Leamy, in each case, by no later than June 24, 2025 at 4:00 p.m. (prevailing Eastern Time). Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

4.3     Requirements for Confirmation.

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

4.4     Classification of Claims and Interests.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified). The Debtors also are required, under

29

section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code further requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If this occurs, the Debtors intend, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

30

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including contractual subordination, if any) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

4.5     Impaired Claims or Interests.

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims or Interests that are Impaired under a plan may vote to accept or reject such plan. Generally, a claim or interest is Impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the Holders of Claims or Interests in an Impaired Class do not receive or retain any property under a plan on account of such claims or interests, such Impaired Class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such Holders are not entitled to vote on such plan.

Under the Plan, only Holders of Claims in Classes 3 and 4 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims or Interests in Classes 5 and 6 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

4.6     Confirmation Without Necessary Acceptances; Cramdown.

In the event that any Impaired Class of Claims or Interests does not accept the plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of Claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting Impaired Class of Claims or Interests. Here, because Holders of Claims and Interests in Classes 5 and 6 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code if the Holders of Claims in Class 3 or 4 accept the Plan. The Debtors believe that such requirements are satisfied, in part, as no Holder of a Claim or Interest junior to those in Classes 5 and 6 will receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests, provided that a debtor may be afforded wide latitude for separately classifying and treating claims of the same priority based on,

31

among other factors, the differing factual or legal nature or attributes of the claims or their holders. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, when taking into account the nature and attribute of such Claims and Interests and their Holders, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Claims or Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a)      Secured Creditors. Either (i) each Impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each Impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)      Unsecured Creditors. Either (i) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)      Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

4.7      Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Debtors' principal assets have been liquidated and the Plan provides

32

for the Distribution of all of the Cash proceeds of the Debtors' Assets to Holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Liquidating Trust to meet its discreet obligations under the Plan.  Based on the Debtors' analysis, the Liquidating Trust will have sufficient assets to accomplish its tasks under the Plan.  Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

4.8     Best Interests Test and Liquidation Analysis.

Even if a plan is accepted by the Holders of each Class of Claims and Interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an Impaired Class of Claims or Interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to Holders of each Impaired Class of Claims and Interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each Impaired Class, the present value of the Distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any Impaired Class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such Impaired Class.

Because the Plan is a reorganization plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.  However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee.  The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors.  Conversion also would likely delay the liquidation process and ultimate Distribution of the Retained Assets.  The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases.

Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section

33

1129(a)(7) of the Bankruptcy Code.  Attached hereto as <u>Exhibit A</u> is a hypothetical chapter 7 liquidation analysis.

        4.9     Acceptance of the Plan.

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes and submission of ballots are set forth in the Interim Approval and Procedures Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT VIA EMAIL WITH A REFERENCE TO "MOLECULAR TEMPLATES" IN THE SUBJECT LINE; OR BY PHONE AT  (877) 634-7178 (DOMESTIC) OR (424) 236-7224 (INTERNATIONAL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.

ARTICLE V
**<u>CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING</u>**

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

        5.1     The Plan May Not Be Accepted.

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of reorganization of the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

34

5.2     The Plan May Not Be Confirmed.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.   Even if the Bankruptcy Court determined that the combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met.   Moreover, there can be no assurance that modifications to the Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.   If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

5.3     Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately projected to be Allowed and the funds available for Distribution.   There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.   These estimated amounts are based on certain assumptions with respect to a variety of factors, including the amount and value of assets available for Distribution and the number and value of Claims ultimately Allowed in these Chapter 11 Cases.   Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtors' estimates.   If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

5.4     Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests.   The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.   The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.   To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.   Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.   There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.   Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a

35

member.  The Debtors believe that they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

5.5     Failure to Consummate the Plan.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court.  Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

5.6     Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual Allowed amounts of Claims may differ from the estimates.  The estimated amounts are based on certain assumptions with respect to a variety of factors.  Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Class 4 General Unsecured Claims under the Plan.

5.7     Plan Releases May Not Be Approved.

There can be no assurance that the releases, as provided in Article X of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

5.8     Certain Tax Considerations.

There are a number of material income tax considerations, risks and uncertainties associated with the Plan described in this combined Disclosure Statement and Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE

36

AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

ARTICLE VI
**TREATMENT OF UNCLASSIFIED CLAIMS**

Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Unimpaired Claims are conclusively presumed to have accepted this Plan. The Holders of Administrative Claims, Fee Claims, DIP Claims, Tax Claims, Other Priority Claims and Other Secured Claims are not Impaired under this Plan.

6.1     Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim (other than Holders of Fee Claims and Claims for U.S. Trustee Fees) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the Allowed amount of such Administrative Claim either: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim; (d) at such time as may be agreed upon by: (i) if prior to the Effective Date, such Holder and the Debtors or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

(a)     Time for Filing Administrative Claims.

Each holder of an Administrative Claim, other than:

a)  a Fee Claim;

b)  an Administrative Claim that has been allowed on or before the Effective Date;

c)  a 503(b)(9) Claim;

d)  an Administrative Claim on account of fees and expenses incurred on or after the Petition Date but before the Effective Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court;

e)  an Administrative Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date but before the

37

Effective Date, but only to the extent that such Administrative Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses; or

f) U.S. Trustee Fees,

must file with the Bankruptcy Court and serve on the Debtors, the Liquidating Trustee, the Claims Agent, and the United States Trustee, proof of such Administrative Claim so as to be received by 5:00 p.m. prevailing Eastern time on the Administrative Claims Bar Date.  Proof of an Administrative Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Claim; (ii) the name of the holder of the Administrative Claim; (iii) the amount of the Administrative Claim; (iv) the basis of the Administrative Claim; and (v) supporting documentation for the Administrative Claim.  FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND RELEASED.

Holders of such Administrative Claims that were required to file and serve such a request by the Administrative Claims Bar Date and that did not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property, or the Liquidating Trust or the Liquidating Trust Assets.  The Debtors or the Liquidating Trustee, as applicable, may file and serve objections to Administrative Claims on or before the Claims Objection Bar Date.

For the avoidance of doubt, this deadline does not apply to 503(b)(9) Claims and the deadline for filing requests for payment of such 503(b)(9) Claims was the General Bar Date, and this deadline set by the Bar Date Order is not extended by this combined Disclosure Statement and Plan nor the Confirmation Order.

With respect to U.S. Trustee Fees, all fees due, payable, and/or may come due to the U.S. Trustee pursuant to section 1930 of Title 28 of the United States Code together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States Code, to the extent applicable ("Quarterly Fees") on account of the period before the Effective Date shall be paid by the Debtors on the Effective Date, or as soon as practicable thereafter to the extent said amount was not yet due and/or billed.  After the Effective Date, (i) the Debtors and the Liquidating Trustee shall be jointly and severally liable to pay all Quarterly Fees accruing from and after the Effective Date until the earliest to occur of the particular Debtor's case being converted to a case under chapter 7 of the Bankruptcy Code, dismissed, or closed and (ii) the Liquidating Trustee and each of the Reorganized Debtors, as applicable, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  The U.S. Trustee shall not be required to file a request for payment of its Quarterly Fees, which shall be deemed an Administrative Claim against the Debtors and their Estates.

6.2     Fee Claims.

(a)     Professional Fees Account.

On the Effective Date, the Debtors or the Liquidating Trustee, as appropriate, shall fund the Professional Fees Account, to the extent not already sufficiently or fully funded.  Fee Claims shall be paid in Cash from funds held in the Professional Fees Account when such Claims are Allowed by a Final Order of the Bankruptcy Court.  Neither the Debtors' nor the Liquidating Trust's obligations to pay Fee Claims shall be limited nor be deemed limited to funds held in the Professional Fees Account.

(b)     Estimation of Fee Claims.

No later than five (5) days before the anticipated Effective Date, Professionals shall provide a good faith estimate of their Fee Claims projected to be outstanding as of the Effective Date and shall deliver such estimate to the Debtors.  Such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall be utilized by the Debtors to determine the amount necessary to fully fund the Professional Fees Account.  The Debtors or the Liquidating Trustee shall use Cash on hand to increase the amount of the Professional Fees Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fees Account based on such estimates.

(c)     Payment of Fee Claims.

All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date and (ii) shall be paid in full from the Professional Fees Account in such amounts as are Allowed by the Bankruptcy Court in accordance with an order entered by the Bankruptcy Court approving the interim compensation of Professionals, upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Liquidating Trustee, as applicable.  Objections to such Fee Claims, if any, must be filed and served no later than twenty (20) calendar days after the filing of such fee application or such other date as established by the Bankruptcy Court.

The Liquidating Trustee is authorized to pay compensation for services rendered or reimbursement of expenses incurred by any Professional after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval in accordance with the Liquidating Trust Agreement.  For the avoidance of doubt, such compensation and reimbursement shall include compensation and reimbursement to the Debtors' Professionals for services rendered and expenses incurred after the Effective Date.  When all Allowed Fee Claims have been paid in full, any remaining amount in the Professional Fees Account shall promptly be released from such escrow

and revert to, and ownership thereof shall vest in, the Liquidating Trust without any further action or order of the Bankruptcy Court.

> (d)    Professional Fees Account Not Property of the Liquidating Trust.

Until payment in full of all Allowed Fee Claims, funds held in the Professional Fees Account shall not be considered Liquidating Trust Assets or otherwise property of the Liquidating Trust, the Debtors, or the Debtors' Estates. The Professional Fees Account shall be treated as a trust account for the benefit of Holders of Fee Claims and for no other parties until all Allowed Fee Claims have been paid in full in Cash. No other Liens, claims or interests shall encumber the Professional Fees Account or Cash held in the Professional Fees Account in any way.

6.3     DIP Claims.

All DIP Claims shall be deemed Allowed on the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon to the date of the payment, and (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Facility and the interim and final orders approving the same. The DIP Claims shall receive, in final satisfaction, compromise, settlement, release, and discharge of such DIP Claim (in whole or in part), (i) payment in full in Cash or (ii) such other treatment as agreed in writing among K2 and the Debtors, including, but not limited to, the New MTEM Common Equity.

6.4     Tax Claims.

Unless otherwise agreed to by the Holder of an Allowed Tax Claim, each Holder of an Allowed Tax Claim will receive in full and final satisfaction of such Allowed Tax Claim Cash in an amount equal to the unpaid portion of such Allowed Tax Claim either: (a) if a Tax Claim is Allowed on or prior to the Effective Date, on the Effective Date by the Debtors; (b) if such Tax Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Tax Claim becomes a Final Order; (c) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder and the Debtors or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, *however*, that all Allowed Tax Claims that are not due, payable, and/or that may become due on or before the Effective Date shall be paid by the Liquidating Trustee in the ordinary course of business as they become due, or as soon as practicable thereafter to the extent said amount was not yet due and/or payable. Any Claim or demand for any penalty (a) will be subject to treatment as a General Unsecured Claim, if and to the extent it is an Allowed Claim, and (b) the Holder of an Allowed Tax Claim shall not assess or attempt to collect such amounts from the Debtors, the Estates, the Liquidating Trustee, or the Liquidating Trust except as a General Unsecured Claim, if and to the extent it is an Allowed Claim.

## ARTICLE VII
## **TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

The Holders of Claims in Classes 1 through 2 are Unimpaired, conclusively deemed to accept the Plan and are not entitled to vote on the Plan. The Holders of Claims in Class 3 and

4 are Impaired and entitled to vote to accept or reject this Plan.  Holders of Claims in Classes 5 and Interests in Class 6 are conclusively deemed to reject the Plan and, therefore, are not entitled to vote on the Plan.

7.1     Class 1: Other Secured Claims.

On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Other Secured Claim and the Debtors agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Secured Claim, each holder thereof shall receive, at the option of the Debtors, as applicable: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

7.2     Class 2: Other Priority Claims.

On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Other Priority Claim and the Debtors agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Priority Claim, each holder thereof shall receive Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim.

7.3     Class 3 Prepetition Secured Claims.

On the Effective Date, the Prepetition Secured Claims shall be deemed Allowed in the full aggregate principal amount of $16,329,989.48, plus any and all accrued and unpaid interest, unreimbursed costs, fees, expenses, and indemnities owed thereunder.  The Prepetition Secured Claims shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of $15,000,000 of such Prepetition Secured Claim, 100% of the New MTEM Common Equity, subject to dilution on account of any distribution of New MTEM Common Equity on account of and in satisfaction of any additional portion of the Prepetition Secured Claims or for the DIP Facility.

7.4     Class 4: General Unsecured Claims.

In full and final satisfaction of the General Unsecured Claims, each holder shall receive its pro rata share of (i) the proceeds, if any, from the prosecution of the Avoidance Actions; and (ii) the General Unsecured Claims Distribution.

7.5     Class 5: Intercompany Claims.

On the Effective Date, all intercompany claims shall be released without any distribution on account of such claims.

41

7.6     Class 6: Interests.

On the Effective Date, the existing Interests of the Debtors shall be deemed canceled, extinguished and discharged and of no further force or effect, and the Holders of such Interests shall not be entitled to receive or retain any property on account of such Interests; *provided, however*, that this cancellation shall not apply to the equity interest of Molecular Templates, Inc. in its subsidiary and affiliated debtor Molecular Templates OpCo, Inc.

7.7     Reservation of Rights Regarding Claims and Interests.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE VIII
## ACCEPTANCE OR REJECTION OF THE PLAN

8.1     Classes Entitled to Vote.

Because Claims in Classes 3 and 4 are Impaired and Holders thereof will receive or retain property or an interest in property under the Plan, only the Holders of Class 3 and 4 Claims shall be entitled to vote to accept or reject the Plan.

8.2     Acceptance by Impaired Classes of Claims.

In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan. In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired class of interests shall have accepted the plan if such plan is accepted by holders of at least two-thirds (2/3) in amount of the allowed interests in such class that have timely and properly voted to accept or reject the Plan.[6]

8.3     Presumed Acceptance by Unimpaired Classes.

Because Claims in Classes 1 and 2 are Unimpaired, pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are deemed to have accepted the Plan and, therefore, Holders of such Claims are not entitled to vote to accept or reject the Plan.

---

[6]     For the avoidance of doubt, as noted in Section 8.4 below, Holders of Interests in the Debtors are not entitled to receive or retain any property under the Plan, and thus Holders of Interests are deemed to reject the Plan.

8.4     Presumed Rejections by Impaired Classes.

Because Holders of Intercompany Claims in Class 5, and Holders of Interests in Class 6 are not entitled to receive or retain any property under the Plan, pursuant to section 1126(g) of the Bankruptcy Code, Holders of Intercompany Claims in Class 5 and Holders of Interests in Class 6 are presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

8.5     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.

Because certain classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes. The Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

8.6     Controversy Concerning Impairment.

If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall determine such controversy on or before the Confirmation Date.

8.7     Elimination of Vacant Classes.

Any Class of Claims that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

8.8     Voting Classes; Deemed Acceptance by Non-Voting Classes.

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

## ARTICLE IX
## **MEANS OF IMPLEMENTING THE PLAN**

In addition to the provisions set forth elsewhere in this Plan, the following shall constitute the means of execution and implementation of this Plan.

9.1     Joint Chapter 11 Plan.

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.

43

9.2     Restructuring Transaction.

On or before the Effective Date, the Debtors shall enter into and take any actions that may be necessary or appropriate to effectuate the Debt-for-Equity Transaction, and the Wind-down of the Debtors, as applicable.

With respect to the Debt-for-Equity Transaction, on the Effective Date, all existing Interests in the Debtors shall be cancelled and discharged as set forth in this Plan; *provided*, *however*, that for the avoidance of doubt, this cancellation shall not apply to the equity interest of Molecular Templates, Inc. in its subsidiary and affiliated debtor Molecular Templates OpCo, Inc. On the Effective Date, the Debtors shall issue new equity interests in Molecular Templates, Inc. (the "New MTEM Common Equity") to K2 HealthVentures Equity Trust LLC, a subsidiary of K2, in exchange for $15,000,000 of the Prepetition Secured Claims, subject to dilution on account of any distribution of New MTEM Common Equity on account of and in satisfaction of any additional portion of the Prepetition Secured Claims or for the DIP Facility (the "Debt-for-Equity Transaction").  Upon the occurrence of the Effective Date, the members of each Debtors' board of directors or managers, as the case may be, shall be deemed to have resigned and be immediately discharged of their duties as directors or managers and the Debtors' new board of directors or managers, as appointed by the holders of the New MTEM Common Equity shall be deemed to be appointed and take control.  The members of the Debtors' board of directors or managers to be appointed by the Holders of the New MTEM Common Equity shall be disclosed in the Plan Supplement.

With respect to the Wind-down, following the Effective Date, the Liquidation Trustee shall wind-down these Chapter 11 Cases, including, but not limited to: (i) prosecuting and/or settling the Avoidance Actions for the benefit of the holders of General Unsecured Claims; and (ii) making distributions to Holders of Allowed Claims in accordance with the terms of this Plan (the "Wind-down").

9.3     Plan Funding.

Distributions under the Plan shall be funded from Retained Assets.

9.4     Distributions on the Effective Date/Dissolution of Debtors.

On the Effective Date, the Debtors shall make any Distributions for Administrative and Priority Claims, DIP Claims, Other Secured Claims or Other Priority Claims that are Allowed on or prior to the Effective Date.

Following the Effective Date, the Debtors shall make their books, records and files available to the Liquidating Trustee as necessary to facilitate the Liquidating Trustee's distribution on account of Allowed claims, prosecution and/or settlement of the Avoidance Actions, and such other purpose as may be agreed between the Debtors and the Liquidating Trustee.

9.5     Liquidating Trust.

a)      Establishment of the Liquidating Trust.

The Liquidating Trust shall be established and shall become effective on the Effective Date.

b)      Vesting of Liquidating Trust Assets.

Upon the occurrence of the Effective Date, the Liquidating Trust Assets shall be transferred to the Liquidating Trust in accordance with this Plan.  The Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, claims, and interests.  Upon transfer of the Liquidating Trust Assets, the Debtors shall have no further duties or responsibilities in connection with the implementation of this Plan.

c)      Liquidating Trust Assets.

The Liquidating Trust Assets include, but are not limited to, the: (a) General Unsecured Claims Distribution, (b) the Avoidance Actions, (c) the Wind-Down Budget, and (d) such other amounts as are necessary to fund distributions on account of Allowed Other Secured Claims, Allowed Priority Claims, and Allowed Administrative Claims.

(1)     Avoidance Actions

All Avoidance Actions will be contributed to the Liquidating Trust.  The Avoidance Actions to the extent not liquidated prior to the Effective Date by the Debtors,  are therefore being preserved and contributed by the Debtors to the Liquidating Trust so that these Causes of Action may be investigated and prosecuted, if possible, by the Liquidating Trustee with any recoveries resulting therefrom to be distributed to the beneficiaries of the Liquidating Trust.  The Liquidating Trust shall have the authority and standing to bring, litigate and settle all Avoidance Actions.  No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidating Trust will pursue or not pursue any and all available Avoidance Actions.  The Liquidating Trustee and the Debtors expressly reserve all rights to prosecute any and all Avoidance Actions of the Debtors against any Entity, except as otherwise expressly provided in the Plan or to the extent released pursuant to other Orders of the Bankruptcy Court.

d)      Creation and Maintenance of Trust Accounts.

On or prior to the Effective Date, appropriate trust accounts will be established and maintained in one or more federally insured domestic banks in the name of the Liquidating Trust. Cash deposited in the trust accounts will be invested, held and used solely as provided in the Liquidating Trust Agreement. The Liquidating Trustee is authorized to establish additional trust accounts after the Effective Date, consistent with the terms of the Liquidating Trust Agreement, as applicable.  After the funding of the trust accounts on the Effective Date via the Wind-Down Budget, the trust accounts will be funded, as applicable, by Cash proceeds obtained through litigation, settlement, disposition, or other monetization of the Liquidating Trust Assets.  Upon obtaining an order of the Bankruptcy Court authorizing final Distributions, any funds remaining

45

in the trust accounts shall be distributed in accordance with this Plan and the Liquidating Trust Agreement, and the trust accounts may be closed.

e)      Trust Distributions.

The Liquidating Trust shall, among other things, administer the Liquidating Trust Assets.  The Liquidating Trustee shall distribute the Liquidating Trust Assets in accordance with the Plan and the Liquidating Trust Agreement.

f)      Duration of the Trust.

The Liquidating Trust shall have an initial term of two years; *provided*, *however*, that the Liquidating Trustee shall be authorized to extend the Liquidating Trust.  The Liquidating Trust may be terminated earlier than its scheduled termination if the Liquidating Trustee determines that it has administered all the Liquidating Trust Assets and performed all other duties required by this Plan and the Liquidating Trust Agreement.  As soon as practicable after the final Distribution Date (unless all asserted Claims are resolved sooner), the Liquidating Trustee shall seek entry of a Final Order closing the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

9.6     Liquidating Trustee.

a)      Appointment.

The initial Liquidating Trustee shall be appointed by the Debtors.  The appointment of the Liquidating Trustee shall be approved in the Confirmation Order and be effective as of the Effective Date.  Successor Liquidating Trustee(s) shall be appointed as set forth in the Liquidating Trust Agreement.

b)      Term.

The Liquidating Trustee's term, including without limitation the term of any Successor Liquidating Trustee(s), shall expire upon termination of the Liquidating Trust pursuant to this Plan and/or the Liquidating Trust Agreement.

c)      Removal.

The U.S. Trustee or any creditor may request the removal of the Liquidating Trustee for "cause" pursuant to a motion Filed with the Bankruptcy Court and served upon (a) the Liquidating Trustee and its counsel, (b) the U.S. Trustee (if not the movant) and (c) all other Entities that have formally requested notice pursuant to Bankruptcy Rule 2002.  In connection with any such motion to remove the Liquidating Trustee, "cause" will include: (a) the Liquidating Trustee's willful failure to perform his, her or its material duties hereunder, which is not remedied within thirty (30) days of notice; (b) the Liquidating Trustee's death; (c) the Liquidating Trustee's mental or physical incapacity that materially and adversely affects the Liquidating Trustee's ability to perform his, her or its duties under the Plan; (d) the Liquidating Trustee's commission of an act of fraud, theft or embezzlement in connection with the Liquidating Trustee's duties under this Plan; (e) the Liquidating Trustee's conviction for the commission of a felony with all appeals

46

having been exhausted or appeal periods lapsed; *provided*, *however*, that no "cause" shall exist involving clause (a) above until the Liquidating Trustee first has failed to cure such failure within thirty (30) days of having been given written notice of such failure. For purposes of the foregoing, no act or failure to act on the part of the Liquidating Trustee shall be considered "willful" unless it is done, or permitted to be done, by the Liquidating Trustee without reasonable belief that the Liquidating Trustee's action or omission was in the best interests of the Debtors.

d)  Powers and Duties.

The Liquidating Trustee shall have the rights and powers set forth in the Liquidating Trust Agreement including, but not limited to, the rights and powers of a trustee under the Bankruptcy Code. The Liquidating Trustee shall be governed in all things by the terms of the Liquidating Trust Agreement and this Plan. The Liquidating Trustee shall administer the Liquidating Trust, and the Liquidating Trust Assets, and make Distributions in accordance with this Plan and the Liquidating Trust Agreement. In addition, the Liquidating Trustee shall, in accordance with the terms of this Plan, take all actions necessary to wind down these Chapter 11 Cases consistent with this Plan and applicable non-bankruptcy law. Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized, empowered and directed to take all actions necessary to comply with this Plan and exercise and fulfill the duties and obligations arising hereunder, including, without limitation:

(1) To implement Distributions to Holders of Allowed Claims as provided for or contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof;

(2) Subject to the applicable provisions of the Plan, to administer the winding-up of these Chapter 11 Cases;

(3) To take all actions necessary to preserve and maximize the value of the Liquidating Trust Assets;

(4) To prosecute the Avoidance Actions transferred to the Liquidating Trust, by which the Liquidating Trust is hereby granted standing to prosecute any of such Avoidance Actions and the authority to settle such Avoidance Actions without Bankruptcy Court approval;

(5) To maintain customary insurance coverage for the protection of the Liquidating Trustee and professionals on and after the Effective Date;

(6) To object to any Claims (Disputed or otherwise), and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of approval of the Bankruptcy Court;

(7) To make decisions, without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidating Trust and to reserve for and/or pay (a) the charges incurred (or anticipated to be incurred) by the Liquidating Trust on or after the Effective Date for services of professionals, without application to the Bankruptcy Court and (b) disbursements, expenses or related support

47

services relating to the winding down of the Debtors and implementation of the Plan, without application to the Bankruptcy Court;

(9)     To pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the U.S. Trustee quarterly post-confirmation financial reports for each of the Debtors until such time as such reports are no longer required, or the Bankruptcy Court orders otherwise, a final decree is entered closing these Chapter 11 Cases or the Chapter 11 Cases are converted or dismissed;

(10)     To dissolve the Liquidating Trust if the Liquidating Trustee determines, in reliance on such professionals as it may retain, that the expense of administering the Liquidating Trust so as to make a final Distribution is likely to exceed the value of the remaining Liquidating Trust Assets;

(11)     To seek one or more final decrees closing the Debtors' Chapter 11 Cases;

(12)     To do all other acts or things consistent with the provisions of this Plan that the Liquidating Trustee deems reasonably necessary or desirable with respect to implementing this Plan; and

e)     Limitation of Liability; Exculpation of Liquidating Trustee.

The Liquidating Trustee and its agents and professionals shall not be liable for actions taken or omitted in their respective capacities as, or on behalf of, the Liquidating Trustee or the Liquidating Trust, except those acts arising out of its or their gross negligence, actual fraud or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. The Liquidating Trustee (and its agents and professionals) shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the Liquidating Trustee or the Liquidating Trust, except for any actions or inactions involving gross negligence, actual fraud or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. Any indemnification claim of the Liquidating Trustee and the other parties entitled to indemnification under this subsection shall be satisfied from the Liquidating Trust Assets, as provided in the Liquidating Trust Agreement. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its professionals.

f)     Records.

The Liquidating Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors, to the extent available, as may be necessary for the disposition of Liquidating Trust Assets and objections to Disputed Claims.

g)     Insurance.

The Liquidating Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Liquidating Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the

Liquidating Trustee, which insurance coverage may, at the sole option of the Liquidating Trustee, be extended for a reasonable period after the termination of the Liquidating Trust Agreement.

9.7     Fees and Expenses of the Liquidating Trustee.

From and after the Effective Date, Liquidating Trust Expenses shall be paid from the Liquidating Trust Assets in the ordinary course of business, in accordance with the Plan and the Liquidating Trust Agreement.  Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Liquidating Trustee, on behalf of the Liquidating Trust, may employ professionals and pay in the ordinary course of business the reasonable fees of any employed professional (including professionals previously employed by the Debtors, but excluding any Affiliates, relatives or Related Parties to the Liquidating Trustee) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Liquidating Trustee, are necessary to assist the Liquidating Trustee in the performance of the Liquidating Trustee's duties under the Plan and the Liquidating Trust Agreement, subject to any limitations and procedures established under the Liquidating Trust Agreement.

9.8     Elimination of Duplicate Claims.

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Liquidating Trustee, as applicable, (i) upon stipulation between the parties in interest without a Claim objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court or (ii) a notice of satisfaction filed on the docket and served on the applicable claimant or interest holder, provided, that such modification shall become effective only after fourteen days' notice to parties in interest and an opportunity to object.

To the extent any Holder of a Claim as listed on the Debtors' Schedules filed one or more proofs of claim against one or more Debtors, such Holder's scheduled claim(s) shall be deemed automatically Disallowed and shall only receive a distribution, if any, upon allowance of the filed Claim in the amount of such Holder's Allowed Claim (if and to the extent ultimately Allowed).

9.9     Distributions.

Except as otherwise provided in this Plan, the Liquidating Trustee shall make Distributions in accordance with the Liquidating Trust Agreement; *provided*, *however*, that the Liquidating Trustee may postpone any Distribution if the Liquidating Trustee determines that the amount of such Distribution would be too small to justify the administrative costs associated with making it.  The Liquidating Trustee shall make continuing reasonable efforts to dispose of the Liquidating Trust Assets, make timely Distributions, and not unduly prolong the duration of the Liquidating Trust.

9.10    Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan (including any action to be undertaken by the Liquidating Trustee or the Debtors) shall be deemed authorized, approved,

49

and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Liquidating Trustee or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

9.11    Directors, Officers, Managers, Members and Authorized Persons of the Debtors.

On the Effective Date, each of the Debtors' directors and officers shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Liquidating Trustee, such directors and officers shall have no continuing or further obligations to the Debtors following the occurrence of the Effective Date. Following the Effective Date, the Debtors shall be managed by the new directors and officers appointed by the holders of the New MTEM Common Equity and identified in the Plan Supplement.

9.12    Closing of the Chapter 11 Cases

On the Effective Date, the Liquidating Trustee or the Debtors, in consultation with the Liquidating Trustee, shall be authorized to file a motion requesting entry of one or more orders of this Court closing any of the Chapter 11 Cases other than the case of In re Molecular Templates, Inc., et al.  Such motion may be heard by the Court on fourteen-days' notice to the U.S. Trustee and all other parties that have requested notice under Local Rule 2002-1(b).  Each Debtor shall be deemed to appoint the Liquidating Trustee to prosecute claims and defenses and make Distributions and attend to other wind-down affairs on behalf of each of the other prior Debtors. The Liquidating Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court and file a motion under Local Rule 3022-1(a) to close the Chapter 11 Case of In re Molecular Templates, Inc., et al. and of any other Debtor whose case remains open at that time.  Upon the filing of such a motion, the Liquidating Trustee shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

9.13    Effectuating Documents; Further Transactions.

On the Effective Date, the Liquidating Trustee and the Debtors are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

9.14    Release of Liens.

Except as otherwise provided in this Plan, the Confirmation Order, or in any document, instrument, or other agreement created in connection with this Plan, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against the property of the

50

Estates shall be released.  The Liquidating Trustee shall have the authority to file lien releases in connection with the foregoing.

9.15    Exemption from Certain Transfer Taxes

To the maximum extent provided by section 1146 of the Bankruptcy Code, under this Plan, (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors or (b) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be taxed under any law imposing a stamp tax or similar tax.  To the extent that the Debtors or Liquidating Trustee elects to sell any property after the Confirmation Date, such sales of property will be exempt from any transfer taxes in accordance with section 1146(a) of the Bankruptcy Code.  All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases shall be deemed to be or have been done in furtherance of this Plan.

9.16    Withdrawal of Plan

The Debtors reserve the right to revoke and withdraw or modify this Plan at any time prior to the Confirmation Date or, if the Debtors are for any reason unable to consummate this Plan after the Confirmation Date, at any time up to the Effective Date.  If the Debtors revoke or withdraw this Plan, (a) nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Entity in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, this Plan was not filed and the Effective Date did not occur.

9.17    D&O Policies.

As of the Effective Date, the Debtors shall be deemed to have assumed all of the D&O Insurance Policies pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Insurance Policies shall remain in full force and effect subject to the terms and conditions of the D&O Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each D&O Insurance Policy.  Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, confirmation of the Plan shall not impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Insurance Policies, and each such obligation will be deemed and treated as an executory contract that has been assumed by the Debtors under the Plan as to which no proof of Claim need be filed.  For the avoidance of doubt, the D&O Insurance Policies provide coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff or tail coverage after the Effective Date to the fullest extent permitted by such policies. On and after the Effective Date, the Debtors, the Wind-down Estates, or the Liquidating Trustee shall not terminate or otherwise reduce the coverage under any of the D&O Insurance Policies in effect or purchased as of the Petition Date, and all directors and officers of

51

the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date. For the avoidance of doubt, nothing herein shall be construed as the Debtors assuming any obligation with respect to any self-insured retention for which the applicable insurer has the ability to assert a prepetition Claim against the applicable Debtor in accordance with the order setting the Bar Date or other order of the Bankruptcy Court.

9.18    Indemnification of Directors, Officers, and Employees.

For purposes of the Plan, the obligation of the Debtors to indemnify and reimburse any Person or entity serving at any time on or after the Petition Date as one of their directors, officers or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any of the Debtors, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor(s), in accordance with any applicable law, or any combination of the foregoing, shall survive confirmation of the Plan and the Effective Date.

9.19    Withholding and Reporting Requirements.

(a)    Withholding Rights.

In connection with the Plan, any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, provincial or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each Holder of an Allowed Claim or any other Person that receives a Distribution pursuant to the Plan shall be liable for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    Forms.

Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Liquidating Trustee or such other Person designated by the Liquidating Trustee (which entity shall subsequently deliver to the Liquidating Trustee any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 or any other form or document as reasonably requested by the Liquidating Trustee or such other Person designated by it to eliminate or reduce any tax (including withholding tax), unless the Liquidating Trustee or such other Person designated by it determines it is not required to eliminate or reduce any tax (including withholding tax).  If such request is made by the Liquidating Trustee or such other Person designated by the Liquidating Trustee and the Holder fails to comply before the date that is 150 days after the request is made, the amount of such Distribution shall irrevocably revert to the Liquidating Trust, and any Claim in respect of

such Distribution shall be forever barred from assertion against any Debtor and its respective property (or the Liquidating Trust or Liquidating Trustee).

9.20    Cancellation of Existing Interests, Securities and Agreements (Including Cancellation of any Authorized but Unissued Shares).

On the Effective Date, notwithstanding anything to the contrary in the Plan, every document, agreement, or instrument (including but not limited to certificates, agreements, options, warrants, rights, restricted stock units, shares, preferred shares, and other instruments evidencing an ownership interest in the Debtors, whether contractual, legal, equitable, or otherwise) evidencing any Interest in or Claim against the Debtors, shall be deemed automatically and immediately cancelled and surrendered without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under any such document, agreement, or instrument evidencing any Interest in or Claim against the Debtors, as the case may be, shall be deemed extinguished; *provided*, *however*, that, the provisions of any such document, agreement or instrument that governs the rights of the Holder of a Claim shall continue in full force and effect solely to the extent necessary to allow Holders of Allowed Claims to receive Distributions or exercise rights solely with respect to Allowed Claims under the Plan; *provided, further,* that for the avoidance of doubt, this cancellation shall not apply to the equity interest of Molecular Templates, Inc. in its subsidiary and affiliated debtor Molecular Templates OpCo, Inc.

For the avoidance of doubt, all authorized but unissued shares of the Debtors (including authorized but unissued shares of common stock by Debtor Molecular Templates, Inc.) shall also be deemed automatically and immediately cancelled as of the Effective Date without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors with respect to such authorized shares shall be deemed immediately extinguished and terminated as of the Effective Date; *provided*, *however*, that this cancellation shall not apply to the equity interest of Molecular Templates, Inc. in its subsidiary and affiliated debtor Molecular Templates OpCo, Inc.

The Reorganized Debtors intend to exist and operate as a private company after the Effective Date.   As promptly as reasonably practicable following the Effective Date, the Reorganized Debtors expect to take all necessary steps to terminate the registration of all Securities under the Exchange Act and Securities Act, including to de-register its existing Interests, and to terminate its reporting obligations under sections 12, 13, and 15(d) of the Exchange Act, including by (1) filing, or causing any applicable national securities exchange to file, a Form 25 with the SEC under the Exchange Act, and (2) filing a Form 15 with the SEC under the Exchange Act.

## ARTICLE X
## **EFFECT OF PLAN ON CLAIMS AND INTERESTS**

10.1    Binding Effect.

This Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Liquidating Trust and the Liquidating Trustee.

By participating in the Plan by voting or by accepting Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim or Interest extinguished, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to and accepted the terms of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever.  For the avoidance of doubt, any holder of a Claim or Interest that opts out of the voluntary releases contained in Section 10.7 of the Plan by (i) checking the "opt out" box on the Ballot, and returning it in accordance with the instructions set forth thereon, or (ii) checking the "opt out" box on the Opt-Out Election Form and returning it in accordance with the instructions set forth thereon, shall not be bound by the voluntary releases contained in Section 10.7 of the Plan.

10.2    Treatment of Claims.

Notwithstanding anything contained in this Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective Distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and the Interests in each Class with due regard to any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(b) and (c) of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence are extinguished by this Plan.

10.3    Discharge of Claims.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

10.4    Injunctions.

**a)      From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust, or the property of any of the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust; or the property of any of the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust, or the property of any of the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust; (iv) asserting setoff unless such setoff was formally asserted in a timely Filed proof of Claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Confirmation Order (notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff) or right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**b)      Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, and other parties in interest, along with their Related Parties, shall be enjoined from taking any actions to interfere with the implementation or substantial Consummation of this Plan by the Debtors, the Liquidating Trustee and/or their respective Related Parties, as applicable.**

**c)      By accepting Distributions pursuant to this Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the Injunctions set forth in this Section.**

10.5    Exculpation.

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from any cause of action for any claim related to any act or omission taking place between the Petition Date and the Plan Effective Date in connection with, relating to, or arising out of, the Cases, the disclosure**

**statement, the Plan, the DIP Facility loan documents, the restructuring support agreement, or any aspect of the Transaction, including any contract, instrument, release or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the disclosure statement or the Plan, the DIP Facility loan documents, the filing of the Cases, the pursuit of confirmation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

        10.6     Releases by the Debtors.

        **Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, effective on the Effective Date, each Released Party is hereby deemed to be hereby released and discharged by the Debtors and their estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any causes of action, directly or derivatively, by, through, for, or because of the foregoing entities on behalf of the Debtors, from any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that the Debtors or their estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim against, or Interest in, a Debtor or other entity, or that any holder of any claim against, or Interest in, a Debtor or other entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors), intercompany transactions, the Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Facility loan documents, the Plan (including, for the avoidance of doubt, the plan supplement), the RSA Term Sheet, the A&R CVR, the Bridge Loan, the Restructuring Transaction or any aspect of the transactions, including any contract, instrument, release, or other agreement or document (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA Term Sheet, the A&R CVR, the Bridge Loan, the Disclosure Statement, the DIP Facility loan documents, the Plan, the plan supplement, before or during the Cases, the filing of the Cases, the pursuit of confirmation, the pursuit of**

consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual intentional fraud, willful misconduct, or gross negligence of such Person. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the plan supplement) executed to implement the Plan or any claim or obligation arising under the Plan. Notwithstanding anything to the contrary in the foregoing, the releases under this section only release claims held by the Debtors or claims that could be asserted by the Debtors under applicable law.

       10.7    Releases by Holders of Claims.

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Plan Effective Date, and with respect to all other Releasing Parties, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that such entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the holder of any Claim or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors), intercompany transactions, the Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Facility loan documents, the Plan (including, for the avoidance of doubt, the plan supplement), the RSA Term Sheet, the A&R CVR, the Bridge Loan, the Restructuring Transaction, or any aspect of the transactions, including any contract, instrument, release, or other agreement or document (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA Term Sheet, the A&R CVR, the Bridge Loan, the Disclosure Statement, the DIP Facility loan documents, the Plan, the plan supplement, before or during the Cases, the filing of the Cases, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, except for claims

**related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual intentional fraud, willful misconduct, or gross negligence of such Person. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the plan supplement) executed to implement the Plan or any claim or obligation arising under the Plan.**

10.8    Extinguishment of Intercompany Claims.

Following the Effective Date, any Claims that any of the Debtors may have against another Debtor shall be forever waived, released and extinguished for all purposes and no Debtor shall have a Claim or Administrative Claim Allowed against the Estate of any other Debtor.

10.9    Terms of Injunctions or Stays.

Unless otherwise provided in this Plan, all injunctions or stays provided for in these Chapter 11 Cases pursuant to Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Cases are closed.

ARTICLE XI
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

11.1    Executory Contracts and Unexpired Leases Deemed Rejected.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned (including any Executory Contract or Unexpired Lease assumed and assigned in connection with the Sale) shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (ii) is a D&O Insurance Policy or an insurance policy; or (iii) is identified for assumption on the Assumption Schedule included in the Plan Supplement. Executory Contracts and Unexpired Leases identified for assumption on the Assumption Schedule shall be deemed assumed pursuant to section 365 of the Bankruptcy Code as of the Effective Date.

11.2    Claims Based on Rejection of Executory Contracts and Unexpired Leases.

If the rejection of any Executory Contract or Unexpired Lease under this Plan gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 4; provided, however, that the General Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtors, the Liquidating Trust, their successors or properties, unless a proof of such Claim is filed and served on the Liquidating Trustee within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the Executory Contract or Unexpired Lease which may include, if applicable, the Confirmation Order.

Unless otherwise ordered by the Court, any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be forever barred from assertion, and shall not be enforceable against the Debtors, the Liquidating Trust, the Debtors' Estates, or the property for any of the foregoing, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

11.3    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in full in Cash on the Effective Date (or as soon as reasonably practicable thereafter), subject to the limitation described below, by the Debtors or the Liquidating Trust, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (i) the amount of the Cure Obligation, (ii) the ability of the Liquidating Trust or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease, or (iii) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of one or more Final Orders, which may include the Confirmation Order, resolving the dispute and approving the assumption or assumption and assignment (as applicable); provided, that the Debtors or the Liquidating Trust (as applicable) may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

11.4    Modifications, Amendments, Supplements, Restatements or Other Agreements.

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other

59

interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

11.5    Reservation of Rights.

Neither the exclusion nor inclusion of any contract or lease in the Assumption Schedules, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Liquidating Trustee, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

ARTICLE XII
**<u>DISTRIBUTIONS</u>**

12.1  Distribution Record Date.

The Debtors and the Liquidating Trustee shall have no obligation to recognize any transfer of the Claims (i) occurring on or after the Effective Date, or (ii) that does not comply with the Bankruptcy Code or Bankruptcy Rules, including Bankruptcy Rule 3001(e).

12.2    Date of Distributions.

Except as otherwise provided herein, the Debtors or the Liquidating Trustee, as applicable, shall direct the Initial Distribution to Holders of Allowed Claims no later than the Initial Distribution Date.  After the Initial Distribution Date, the Liquidating Trustee shall, from time to time, determine the subsequent Distribution Dates.

12.3    Delivery of Distributions.

The Liquidating Trustee shall make all Distributions, allocations, and/or issuances required under the Plan.  In the event that any Distribution to any Holder of an Allowed Claim is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Debtors or the Liquidating Trustee, as applicable, has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided, however*, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of four (4) months from the date such Distribution was made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court for

60

Distribution in accordance with the Plan and the Claim of any such Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

12.4    Manner of Payment Under the Plan.

Any Distribution made by the Debtors or Liquidating Trustee, as applicable, pursuant to this Plan will be in U.S. dollars.  In the case of foreign creditors, Distribution payments may be made, at the option of the Debtors or Liquidating Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular jurisdiction.  At the option of the Debtors or the Liquidating Trustee, as applicable, any Distribution to be made hereunder may be made by a check or wire transfer.  Any wire transfer fees incurred in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient Holder's Allowed Claim.  The wire transfer fee will be deducted from the amount of the Distribution a Holder of an Allowed Claim would otherwise receive.  The Debtors or the Liquidating Trustee, as applicable, will, to the extent practicable, make aggregate Distributions on account of all the Allowed Claims held by a particular Holder.

12.5    Minimum Cash Distributions.

No intermediate Distribution shall be required to be made to any holder of an Allowed Claim on any Distribution Date of Cash less than $100; *provided, however*, that if any Distribution is not made pursuant to this Section 12.5, such Distribution shall be added to any subsequent Distribution to be made on behalf of the Holder's Allowed Claim.  The Debtors and the Liquidating Trustee shall not be required to make any final Distributions of Cash less than $50 to any Holder of an Allowed Claim.

12.6    Setoffs.

On or after the Effective Date, the Liquidating Trustee, may, pursuant to applicable law (including section 553 of the Bankruptcy Code), offset against any Claim, including an Administrative Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that the Debtors or the Liquidating Trustee may hold against the Holder of such Claim.

12.7    Allocation of Distributions Between Principal and Interest.

Except as otherwise provided in this Plan, to the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

12.8    No Postpetition Interest on Claims.

Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect

61

of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

12.9    No Distribution in Excess of Amount of Allowed Claim.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

ARTICLE XIII
**PROCEDURES FOR DISPUTED CLAIMS**

13.1    Objections to Claims.

Unless otherwise provided in this Plan, after the Effective Date through the applicable Claims Objection Deadline, the Liquidating Trustee shall have standing to object to Claims in order to have the Bankruptcy Court determine the amount and treatment of any Claim. Subject to the terms of the Liquidating Trust Agreement, from and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Except as otherwise provided in this Plan, if a party files a Proof of Claim and (i) the Debtors, a party in interest or the Liquidating Trustee, as applicable, file an objection to that Claim or otherwise formally challenge the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim shall be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in this Plan.

13.2    Estimation of Claims.

The Debtors or the Liquidating Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

13.3    No Distribution Pending Allowance.

No Distribution provided under the Plan shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim; provided however, that a Distribution may be made on an Allowed portion of a Claim pending adjudication of the Disputed portion of such Claim.

13.4    Resolution of Claims.

Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Liquidating Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Liquidating Trust may hold against any Person, and any contract, instrument, release, indenture or other agreement entered into in connection herewith. From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

13.5    Insured Claims.

If any portion of an Allowed Claim is an Insured Claim, no Distributions under the Plan shall be made on account of such Allowed Claim until the Holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged (i) without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court and (ii) with a notice of satisfaction filed on the docket and served on the applicable claimant or interest holder.

ARTICLE XIV
**CONFIRMATION AND CONSUMMATION OF THE PLAN**

14.1    Conditions to Confirmation.

The following are conditions precedent to the occurrence of the Confirmation Date.

a)    A Final Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court;

b)    Entry of a Confirmation Order that is in form and substance acceptable in all respects to the Debtors;

c)    All documents contained in the exhibits and the Plan Supplement are in form and substance acceptable in all respects to the Debtors are approved by the Bankruptcy Court; and

d)    Approval of all provisions, terms, and conditions hereof shall be contained in the Confirmation Order.

14.2    Conditions to Effective Date.

63

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors or K2 (in their respective sole and absolute discretion) (and, for the avoidance of doubt, the Debtors reserve the right to waive section 14.2(i) in their discretion):

a)      The Court shall have entered the Final DIP Order, in form and substance acceptable to K2, and the final order shall not have been vacated, stayed, or modified without the prior written consent of K2 and there shall be no default or event of default existing under the DIP Facility;

b)      All financing necessary for the Plan shall have been obtained, and any documents related thereto shall have been executed, delivered, and be in full force and effect (with all conditions precedent thereto, other than the occurrence of the Plan Effective Date or certification by the Debtors that the Plan Effective Date has occurred, having been satisfied or waived);

c)      All related expenses shall have been paid in full in cash in accordance with the terms and conditions set forth in this Term Sheet and the Final DIP Order;

d)      All requisite filings with governmental authorities and third parties shall have become effective, and all such governmental authorities and third parties shall have approved or consented to the Restructuring Transactions, to the extent required;

e)      The Debtors and K2 have agreed on a Wind-Down Budget;

f)      All documents contemplated hereby to be executed and delivered on or before the Effective Date shall have been executed and delivered, including the liquidating trust agreement (as provided for in the Plan Supplement);

g)      The Confirmation Order shall have been entered, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified,  and shall provide that the Debtors, the Liquidating Trust, and the Liquidating Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with this Plan and effectuate, advance, or further the purposes thereof;

h)      The Confirmation Order, the Plan and all Plan Exhibits shall be, in form and substance acceptable in all respects to the Debtors and shall have been executed and delivered by all parties signatory thereto;

i)      All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed;

j)      The Confirmation Order shall have become a Final Order; and

k)      The Debtors shall have filed a Notice of Effective Date.

64

14.3    Consequences of Non-Occurrence of Effective Date.

If the Effective Date does not timely occur, the Debtors reserve all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated and that this Plan be null and void in all respects.  If the Bankruptcy Court enters an order vacating the Confirmation Order, the time within which the Debtors may assume and assign or reject all Executory Contracts and Unexpired Leases not previously assumed, assumed and assigned or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

14.4    Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

14.5    Effect of Vacatur of Confirmation Order.

If the Confirmation Order is vacated, (a) no further Distributions under the Plan shall be made; (b) the Debtors and all Holders of Claims and Interests shall, to the extent deemed possible, be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

ARTICLE XV
**ADMINISTRATIVE PROVISIONS**

15.1    Retention of Jurisdiction.

Notwithstanding Confirmation of this Plan or occurrence of the Effective Date, and except as otherwise provided by applicable law, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including for the following purposes:

a)    To determine the allowability, classification or priority of Claims upon objection of the Liquidating Trustee or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual liens and other encumbrances;

b)    To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and Consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in these Chapter 11 Cases on or before the Effective Date with respect to any Entity;

65

c)    To protect the property of the Estates, including Liquidating Trust Assets, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens on property of the Estates or Liquidating Trust Assets;

d)    To determine any and all applications for allowance of Fee Claims;

e)    To determine any Administrative and Priority Claim, Other Priority Claims, or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

f)    To resolve any disputes arising under or related to the implementation, execution, Consummation or interpretation of this Plan and the making of Distributions hereunder;

g)    To determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or Unexpired Leases, or to determine any motion to reject an Executory Contract or Unexpired Lease pursuant to section 3 of this Plan;

h)    To determine all applications, motions, adversary proceedings, contested matters, actions and any other litigated matters instituted in and prior to the closing of these Chapter 11 Cases, including any remands;

i)    To enter one or more Final Orders closing the Debtors' Chapter 11 Cases;

j)    To modify this Plan under section 1127 of the Bankruptcy Code, to remedy any defect, cure any omission or reconcile any inconsistency in this Plan or the Confirmation Order so as to carry out its intent and purposes;

k)    To issue such orders in aid of Consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

l)    To enable the Liquidating Trustee to prosecute any and all proceedings to set aside Liens and to recover any transfers, assets, properties or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be expressly waived pursuant to this Plan;

m)    To determine any tax liability of the Debtors or the Liquidating Trust pursuant to section 505 of the Bankruptcy Code, and to address any request by the Liquidating Trustee or the Liquidating Trust for a prompt audit pursuant to section 505(b) of the Bankruptcy Code;

n)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

66

o)      To resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Bar Date Order or the otherwise applicable Claims bar date, the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing;

p)      To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in these Chapter 11 Cases;

q)      To resolve any disputes concerning any exculpation of a non-debtor hereunder or the injunction against acts, employment of process or actions against such non-debtor arising hereunder;

r)      To approve (to the extent necessary or deemed advisable by the Liquidating Trustee) any Distributions, or objections thereto, under this Plan;

s)      To approve any offset exercised by the Liquidating Trustee; and

t)      To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

15.2    Amendments.

a)      Preconfirmation Amendment.  The Debtors may modify this Plan at any time prior to the entry of the Confirmation Order, provided that this Plan, as modified, and the disclosure statement pertaining thereto meet applicable Bankruptcy Code requirements.

b)      Postconfirmation Amendment Not Requiring Resolicitation. After the entry of the Confirmation Order but prior to the Effective Date, the Debtors may modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided that: (a) the Debtors obtain approval of the Bankruptcy Court for such modification, after notice and a hearing and (b) such modification shall not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under this Plan.

c)      Postconfirmation and Pre-Consummation Amendment Requiring Resolicitation.  After the Confirmation Date and before substantial Consummation of this Plan, the Debtors may modify this Plan in a way that materially or adversely affects the interests, rights, treatment, or Distributions of a Class of Claims or Interests, provided that: (i) this Plan, as modified, meets applicable Bankruptcy Code requirements; (ii) the Debtors obtain Bankruptcy Court approval for such modification, after notice and a hearing; (iii) such modification is accepted by at least two-thirds in amount, and more than one-half in number, of Allowed Claims or Interests voting in each Class materially or adversely affected by such modification; and (iv) the Debtors comply with section 1125 of the Bankruptcy Code with respect to this Plan as modified.

67

15.3    Successors and Assigns.

The rights, benefits and obligations of any person or entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person or entity.

15.4    Governing Law.

Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal laws apply, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

15.5    Corporate Action.

Any matters provided for under this Plan involving the corporate structure of the Debtors or corporate action, as the case may be, to be taken by or required of the Debtors shall be deemed to have occurred and be effective as of the Effective Date and shall be authorized and approved in all respects, without any requirement of further action by the Debtors or the Liquidating Trustee, as the case may be.

15.6    Effectuating Documents and Further Transactions.

The Debtors and the Liquidating Trustee shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases, and other agreements and take such other actions as may be necessary to effectuate and further evidence the terms and conditions of this Plan.

15.7    Control Provision.

To the extent this Plan is inconsistent with the Disclosure Statement or the Plan Supplement (including Liquidating Trust Agreement), this Plan controls over the Disclosure Statement and the Plan Supplement.  However, if a Plan Supplement document (including the Liquidating Trust Agreement) expressly states that a specific provision controls over the Plan and Disclosure Statement, the Plan Supplement (including the Liquidating Trust Agreement) shall control.  To the extent the Confirmation Order is inconsistent with this Plan, the Disclosure Statement or the Plan Supplement, the Confirmation Order (and any other orders of this Bankruptcy Court) controls over this Plan, the Disclosure Statement and the Plan Supplement.

15.8    Miscellaneous Rules.

This combined Disclosure Statement and Plan is subject to the following miscellaneous rules: (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order; (ii) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; and (iii) whenever this Plan provides that a payment or Distribution shall occur "on" any date, it shall mean "on, or as soon as reasonably practicable after", such date.

68

15.9    Notices.

All notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

Liquidating Trustee:
To be provided in the Plan Supplement

Debtors:
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Eric D. Schwartz
Andrew R. Remming
Luke Brzozowski
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Tel: (302) 658-9200
Email: eschwartz@morrisnichols.com and aremming@morrisnichols.com

15.10   No Admissions or Waiver.

Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including liability on any Claim or the propriety of a Claim's classification.

*Craig T. Jalbert*
Craig T. Jalbert, CEO

69

**Exhibit A**

**Liquidation Analysis**

## GLOBAL NOTES TO LIQUIDATION ANALYSIS

Even if a plan is accepted by the Holders of each Class of Claims, the Bankruptcy Code requires the Court to determine that the Plan is in the best interests of all holders of Claims that are impaired by the Plan and that have not accepted the Plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Disclosure Statement and Plan satisfy section 1129(a)(7) of the Bankruptcy Code and that each Holder of an Allowed Claim will receive value under the Disclosure Statement and Plan on the Effective Date that is not less than the value such Holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code.  This liquidation analysis ("Liquidation Analysis")[7] and the conclusions set forth herein represent the Debtors' best judgment and estimate regarding the results of such a liquidation.  This Liquidation Analysis was prepared for the sole purpose of assisting the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code and should not be used for any other purpose.  Nothing contained in this Liquidation Analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical chapter 7 liquidation analysis for purposes of meeting the requirements of section 1129(a)(7) of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims if a debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.

On May 23, 2025, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Lender, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Final DIP Order").  Pursuant to the Final DIP Order, the Court approved, on a final basis, a $12 million DIP Facility provided by K2 HealthVentures LLC, ("K2") to the Debtors.  The DIP Facility is secured by senior security interests and claims in all DIP Collateral, which includes, all the Debtors' assets, as well as Avoidance Actions and the proceeds thereof, among other things.[8]

---

[7]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement and Plan or the Final DIP Order.

[8]   The summaries and descriptions contained herein are intended solely for informational purposes to provide the Court and parties in interest with an overview of the assumptions that are built into the Liquidation Analysis.  The summaries and descriptions are qualified in their entirety by the Final DIP Order.  In the event there is any conflict

If the Debtors liquidate under chapter 7 of the Bankruptcy Code, any proceeds from the liquidation of the Debtors' assets and the Avoidance Actions will not be available for distribution to creditors other than K2 because the Debtors' assets and Avoidance Actions are fully encumbered by the senior secured liens and claims of K2.

Furthermore, the costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases. Conversion also would delay the liquidation process and likely reduce the value of the Debtors' assets. Accordingly, while the Debtors believe it is highly unlikely that a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code would yield a recovery to general unsecured creditors, any such recovery would be reduced or eliminated due to the costs, expenses and delay described above.

The Debtors have determined, as summarized in the following analysis (attached hereto as **Exhibit 1**)[9], upon the Effective Date, the Plan will provide all Holders of Claims with a recovery (as applicable) that is greater than or equal to what such Holders would receive pursuant to a liquidation under chapter 7 of the Bankruptcy Code. As such, the Debtors believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

1.      All amounts are estimated as of April 20, 2025, unless otherwise stated.

2.      As of this date, no valuation of the Avoidance Actions has been performed. An evaluation is underway regarding the existence of Avoidance Actions. The Avoidance Actions consist of litigation claims, and, therefore, it is inherently difficult to determine their value.

3.      Additional costs and expenses would be incurred related to liquidation under chapter 7, including the compensation of one or more chapter 7 trustee(s), counsel and other professionals retained by the chapter 7 trustee.

---

between these summaries and descriptions and the Final DIP Order, the Final DIP Order shall control in all respects.

[9]   A number of estimates and assumptions underlie the analysis that, while considered reasonable, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors, their management and advisors. Independent accountants have not examined or reviewed this Liquidation Analysis. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO LIQUIDATE UNDER CHAPTER 7.

The Liquidation Analysis contains an estimate of the value of Claims that ultimately will become Allowed Claims. The Debtors have not completed a final evaluation or, nor has the Bankruptcy Court determined, the amount of each such Claim. Accordingly, the final amount of Allowed Claims may differ from the Claim amounts presented in this Liquidation Analysis. Upon information and belief, the Debtors do not believe that any variance between the estimates contained herein, and the final Allowed Claims would have a material effect on the Liquidation Analysis for purposes of section 1127(a)(7) of the Bankruptcy Code.

4.      The Estimated Distribution Amount, as referenced in **Exhibit 1**, will be a result of, among other factors, negotiations with the DIP Lender prior to the filing of the Plan Supplement.

5.      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement and Plan.

3

**Exhibit 1**

**Liquidation Analysis**

# MOLECULAR TEMPLATES (MTEM)

*Liquidation Analysis*

Case 25-10739-BLS  Doc 177-1  Filed 07/02/25  Page 81 of 81

| | as of 04/20/2025 | Realization % | | Ch. 11 Restructuring | | Chapter 7 | |
|---|---|---|---|---|---|---|---|
| | | *Low* | *High* | Low | High | Low | High |
| **I. Assets:** | | | | | | | |
| Cash-on-hand | $ 2,914 | 100% | 100% | $ 2,914 | $ 2,914 | $ 2,914 | $ 2,914 |
| Trade Notes & Accounts Receivable | 14,912 | 0% | 100% | - | 14,912 | - | 14,912 |
| Prepaid Expenses | 288,716 | 0% | 5% | - | 14,436 | - | 14,436 |
| PP&E | - | 100% | 100% | - | - | - | - |
| Right-of-use asset (Operating Lease) | 7,591,827 | 0% | 0% | - | - | - | - |
| Intellectual Property | 541,369 | 0% | 0% | - | - | - | - |
| Sale Proceeds (Debt-for-Equity swap) | 15,000,000 | 100% | 100% | 15,000,000 | 15,000,000 | 100,000 | 500,000 |
| Ch. 5 Avoidance Actions | 500,000 | 0% | 10% | - | 50,000 | - | 50,000 |
| **Total Estimated Proceeds** | | | | $ 15,002,914 | $ 15,082,262 | $ 102,914 | $ 582,262 |
| **II. Secured, Administrative & Priority Claims:** | | | | | | | |
| *Secured Debt Obligations* | | | | | | | |
| Senior Secured Amended & Restated CVR Agreement | 15,550,000 | 100% | 100% | 15,550,000 | 15,550,000 | $ 15,550,000 | $ 15,550,000 |
| Debtor-in-Possession Financing | 12,000,000 | 100% | 100% | 12,000,000 | 12,000,000 | $ 12,000,000 | $ 12,000,000 |
| Senior Secured Bridge Loan | 1,370,000 | 100% | 100% | $ - | $ - | $ - | $ - |
| Less: Credit Bid noted above | | | | $ (15,000,000) | $ (15,000,000) | $ (100,000) | $ (500,000) |
| | 28,920,000 | | | 12,550,000 | 12,550,000 | 27,450,000 | 27,050,000 |
| *Administrative Debt Obligations* | | | | | | | |
| Bankruptcy Professional Fees | 2,375,000 | 100% | 90% | 2,375,000 | 2,137,500 | 2,375,000 | 2,137,500 |
| Claims Agent | 250,000 | 100% | 90% | 250,000 | 225,000 | 250,000 | 225,000 |
| US Trustee Fees | 25,000 | 100% | 100% | 25,000 | 25,000 | 25,000 | 25,000 |
| Chapter 7 Trustee Fees | 75,000 | 150% | 100% | | | 112,500 | 75,000 |
| Chapter 7 Trustee's Professional(s) | 250,000 | 110% | 95% | | | 275,000 | 237,500 |
| | 2,650,000 | | | 2,650,000 | 2,387,500 | 3,037,500 | 2,700,000 |
| *Priority Debt Obligations* | | | | | | | |
| Priority Tax Claims | 100,000 | 100% | 50% | $ 100,000 | $ 50,000 | $ 100,000 | $ 50,000 |
| Estimated Windown Costs | 100,000 | 125% | 85% | 125,000 | 85,000 | 125,000 | 85,000 |
| | 200,000 | | | 225,000 | 135,000 | 225,000 | 135,000 |
| **Funds Available After Distribution to Secured, Admin & Priority Claims** | | | | $ (422,086) | $ 9,762 | $ (30,609,586) | $ (29,302,738) |
| **III. Unsecured Claims** | | | | | | | |
| General Unsecured Creditors | $ 3,760,798 | 120% | 95% | $ 4,512,958 | $ 3,572,759 | $ 4,512,958 | $ 3,572,759 |
| **Est. Distribution Amount [1]** | | | | $ 50,000 | $ 400,000 | $ - | $ - |

[1] The Estimated Distribution Amount will be a result of, among other factors, negotiations with the Secured Lender prior to the filing of the Plan Supplement.

Molecular Templates, Inc., et al.
Case No.: 25-10739

Liquidation Analysis

Page 1 of 1